**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
         jvenditti@bursor.com

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.P. and F.C., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NBCUNIVERSAL MEDIA, LLC; UNIVERSAL CITY STUDIOS LLC d/b/a Universal Studios Hollywood; UNIVERSAL CITY DEVELOPMENT PARTNERS, LTD. d/b/a Universal Orlando Resort; and UNIVERSAL CITY TRAVEL PARTNERS d/b/a Universal Parks & Resorts Vacations,<br><br>Defendants. | Case No.   2:24-cv-2889<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) Violation of Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.*<br>(2) Violation of California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51, *et seq.*<br>(3) Violation of the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq.*<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs D.P. and F.C. (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants NBCUniversal Media, LLC, Universal City Studios LLC d/b/a Universal Studios Hollywood, Universal City Development Partners, Ltd. d/b/a Universal Orlando Resort, and Universal City Travel Partners d/b/a Universal Parks & Resorts Vacations (collectively, "Defendants" or "Universal").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## INTRODUCTION

1.      This putative class action lawsuit seeks to put an end to systemic civil rights violations committed by Universal against disabled individuals, as set forth under Title III of the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq*., and corresponding California statutes,[1] within California and across the United States.

2.      Defendants own and operate Universal-branded theme parks and resort properties around the world, including in California and Florida—namely, "Universal Studios Hollywood,"[2] a theme park located in Universal City, California,

_____

[1] The ADA generally prohibits "public accommodations" from discriminating against people with disabilities.  *See* 42 U.S.C. § 12182(a).  Likewise, California has enacted several statutes which also bar discrimination against people with disabilities, including the Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq*., and the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq*., both of which state that a violation of the ADA is a violation of each of those respective acts.  *See* Cal. Civ. Code § 51(f); Cal. Civ. Code § 54.1(d).

[2] Universal Studios Hollywood is a theme park in the San Fernando Valley area of Los Angeles County, California.  Universal Studios Hollywood, which was established in the 1960s, was the first of many full-fledged Universal Studios Theme Parks located across the world.  In 2022, Universal Studios Hollywood ranked thirteenth in the world – ninth in North America – for overall attendance among amusement parks with approximately 8.4 million visitors.  *See* Themed Entertainment Association ("TEA"), *TEA/AECOM 2022 Theme Index and Museum*

_____

and "Universal Orlando Resort,"[3] a theme park and entertainment resort complex located in Orlando, Florida (collectively, "Universal Studios Theme Parks," "Universal Theme Parks," the "Amusement Parks," or the "Parks").  In fact, with approximately 32,025,000 visitors across all Universal Theme Parks located in the

---

*Index: The Global Attractions Attendance Report*, at 14-15, *available at* https://aecom.com/wp-content/uploads/documents/reports/AECOM-Theme-Index-2022.pdf.

[3] Universal Orlando Resort includes three distinct parks: "Universal Studios Florida," "Universal Islands of Adventure," and "Universal's Volcano Bay" (collectively, "Universal Orlando Resort" or "Universal Orlando").

**Universal Studios Florida** ("Universal Florida"), which opened in 1990, was the first of the three theme parks to open at Universal Orlando, joined later by Islands of Adventure in 1999 and Volcano Bay in 2017.  Universal Florida features numerous rides, attractions, and live shows that are primarily themed to movies, television, and other aspects of the entertainment industry.  It also operates a well-known annual event during the fall season called Halloween Horror Nights, where the park transitions to a Halloween theme featuring haunted houses and scare zones on select nights.  *See 2022 Global Attractions Attendance Report*, *supra*, at 21 ("Universal's extremely popular Halloween Horror Nights (HHN) events in the fall continue to be a major driver of attendance for the company.  As a separate ticketed event the parks essentially double their attendance for a day with day guests and night guests visiting the park.  It's so popular that Universal Orlando announced early this year that HHN 2023 will take place over 44 nights, more than ever before.").  In 2022, Universal Florida ranked seventh in the world – fifth in North America – for overall attendance among amusement parks with approximately 10.75 million visitors.  *See id*. at 14.

**Universal Islands of Adventure** (also known as "Islands of Adventure" or "IOA") is another theme park within Universal Orlando, which opened in 1999.  IOA is modeled after a journey of exploration, where guests embark on an adventure to visit a variety of themed islands.  Currently, IOA features seven islands, including the wildly popular *The Wizarding World of Harry Potter*, which was added in 2010.  In 2022, IOA ranked fifth in the world – third in North America – for overall attendance among amusement parks with approximately 11.025 million visitors.  *See 2022 Global Attractions Attendance Report*, *supra*, at 14.

**Universal's Volcano Bay** ("Volcano Bay") is a tropical-themed water park and, having opened in 2017, the newest of three theme parks at Universal Orlando.  Volcano Bay was constructed on approximately 53 acres of the resort complex's overall property and includes a wave pool, a thrill slide coming from the park's central volcano, and other water slides, pools, and attractions.  In 2022, Volcano Bay ranked second in the world and North America for overall attendance among *water* parks with approximately 1.85 million visitors.  *See 2022 Global Attractions Attendance Report*, *supra*, at 33.

---

United States in 2022, Universal Theme Parks rank among the most visited amusement parks in the world.[4]  The Universal Theme Parks are places of public accommodations subject to Title III of the ADA, the Unruh Act, and the CDPA.  *See* ADA, 42 U.S.C. § 12181(7)(I).

3. As explained in detail below, Plaintiffs are natural persons who have substantially limiting physical and/or mental impairments.  Plaintiffs are therefore individuals with disabilities within the meaning of state and federal civil rights laws.

4. As disabled Americans, Plaintiffs have the right to meaningfully access, enjoy, and participate in society just as non-disabled persons do.  No person or entity subject to Title III of the ADA may discriminate against an individual on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.  *See* 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201.  Nor can a public accommodation deny disabled persons the opportunity to participate in or benefit from the entity's goods, services, facilities, privileges, advantages, or accommodations, *see* 42 U.S.C. § 12182(b)(1)(A)(i); provide disabled persons with a benefit that is unequal to that afforded to other individuals, *see id*. § 12182(b)(1)(A)(ii); provide disabled persons a different or separate good, service, facility, privilege, advantage, or accommodation from that provided to other individuals, *see id*. § 12182(b)(1)(A)(iii); or utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability, *see id*. § 12182(b)(1)(D).

5. Further, public accommodations cannot impose impermissible eligibility criteria that screen out or tend to screen out individuals with disabilities unless the criteria are shown to be necessary for the provision of the public accommodation's goods and services.  42 U.S.C. § 12182(b)(2)(A)(i).  And they must make "reasonable modifications in polices, practices, or procedures, when such

---

[4] *See 2022 Global Attractions Attendance Report*, *supra*, at 14-15, 33.

modifications are necessary" to provide disabled individuals full and equal enjoyment. *Id*. § 12182(b)(2)(A)(ii).

6.     The U.S. Department of Justice's ("DOJ") regulations implementing the ADA further provide that a "public accommodation shall not ask about the nature or extent of a person's disability … [and] shall not require documentation[.]" 28 C.F.R. § 36.302(c)(6).

7.     Defendants discriminated against Plaintiffs by failing to provide them with an opportunity to participate in and benefit from Defendants' theme park services free from discrimination.  Specifically, on or around July 24, 2023, Universal implemented its current procedures for making accommodation requests at Defendants' amusement parks in the United States, called the "Attraction Assistance Program."  Under the Attraction Assistance Program, Defendants require guests with disabilities to register ahead of their visits to Universal Studios theme parks in California and Florida with the International Board of Credentialing and Continuing Education Standards ("IBCCES").  Despite its name, the IBCCES is a private, for-profit company that is not affiliated with any governmental agency or regulatory body.  The IBCCES describes itself as "the industry leader in cognitive disorder training and certification for healthcare, education and corporate professionals around the globe."  To obtain an accommodation at the Amusement Parks at issue, guests must register online with IBCCES and obtain an Individual Accessibility Card ("IAC") at least 48 hours in advance of their park visits.  Further, as part of the online registration process, guests must disclose sensitive personal information and provide private medical documentation in support of their accommodation requests.  This requirement violates the ADA's implementing regulation under 28 C.F.R. § 36.302(c)(6).

8.     To ensure compliance with the ADA, "[p]ublic accommodations must … consider[] how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience." *Baughman v.*

*Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).  Here, nondisabled guests visiting Defendants' theme parks may purchase their tickets for admission to Universal Studios in California and/or Florida at, and upon arrival to, Defendants' facilities, and they may then enter the Parks and enjoy all the benefits on offer, without any advance planning or preparation.  But because disabled persons must gather the necessary medical documentation and submit it with their application on the IBCCES website *prior* to their Park visits, persons with disabilities do not have that same luxury afforded to nondisabled persons.

9.      Defendants have therefore failed to implement policies, procedures, and practices respecting the civil rights and needs of disabled individuals.  Instead of ensuring access, Defendants' disability access policy has prevented disabled persons from exercising their rights to meaningfully access, enjoy, and participate in society just as non-disabled persons.

10.      As explained below, Plaintiff D.P. submitted an IBCCES application (which included submission of sensitive medical documentation), obtained an IAC from IBCESS, and visited Defendants' facility in California during the relevant period.

11.      Further, Plaintiff F.C. also visited Defendants' facility in California during the relevant period.  However, due to privacy and dignity concerns, F.C. did not register with IBCCES or submit a request for accommodations at Universal through the IBCCES website in advance of his park visit.  Instead, F.C. sought necessary and reasonable accommodations in-person at the park, on the day of his park visit.  However, because F.C. failed to satisfy the advanced registration requirement of Universal's new disability access policy, Defendants refused to issue an Attraction Assistance Pass or entertain his request for accommodations in connection with F.C.'s park visit.  Under Universal's new policy, by the time F.C. arrived to the park, it was already too late.

12.     In both cases, Plaintiffs were denied full and equal access as a result of Defendants' Attraction Assistance Program.  Similar denials of full and equal access to Defendants' services have been faced around the country by members of the putative classes.  Defendants require all disabled park guests use the unlawful IBCCES system to request accommodations at Defendants' amusement parks.  If they do so, they must comply with the mandatory requirement to disclose of sensitive personal information and submit private medical documentation, to the detriment of their privacy and dignity interests.  If they do not do so in advance of their park visit (*e.g.*, because they were unaware of the policy and assumed they could seek accommodations in person at Defendants' facilities on the day of their park visit, as was previously permissible, or would prefer to request accommodations through another format due to privacy and dignity concerns), then guests are deprived of their ability to seek accommodations during their park visit whatsoever, as Defendants will not issue an Attraction Assistance Pass or even consider an accommodation request from guests who have not complied with the advanced registration requirement.

13.     Defendants' decision to implement the Attraction Assistance Program at their theme parks in 2023 was, on information and belief, based purely on financial considerations, and resulted in the widespread violation of Plaintiff's and putative Class Members' civil rights.

14.     Accordingly, Plaintiffs bring this action individually and on behalf of all others similarly situated to compel Defendants to cease unlawful discriminatory practices and implement policies and procedures that will ensure Plaintiffs' and Class Members' full and equal enjoyment of, and a meaningful opportunity to participate in and benefit from, Defendants' services.  Plaintiffs seek declaratory, injunctive, and equitable relief and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Title III of the ADA, 42 U.S.C. §§ 12101 *et seq.*, and its implementing regulations.

15.     Additionally, Plaintiffs bring this action individually and on behalf of all other similarly situated California residents and seeks declaratory, injunctive, and equitable relief and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability at Universal Studios Hollywood, in violation of California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq.*, and California's Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq.*, and for statutory damages in accordance with California Civil Code §§ 52(a) and 54.3.

16.     The ADA and the Unruh Act expressly contemplate injunctive relief aimed at modification of a policy or practice that Plaintiffs seek in this action.  *See* ADA, 42 U.S.C. § 12188(a)(2) ("Where appropriate, injunctive relief shall also include requiring the provision of … service, modification of a policy, or provision of alternative methods."); *see also* Unruh Act, Cal. Civ. Code § 52(c)(3).

17.     Consistent with 42 U.S.C. § 12188(a)(2) and the Unruh Act, Plaintiffs seek a permanent injunction requiring that, *inter alia*: (1) Defendants take all steps necessary to bring their disabilities accommodations request process into full compliance with the requirements set forth in the ADA and its implementing regulations, as detailed below; (2) Defendants adequately train park employees regarding the civil rights, communication needs, and privacy considerations of disabled individuals; and (3) Plaintiff's representatives monitor Defendants' facilities to ensure the injunctive relief ordered pursuant has been implemented and will remain in place.

18.     Plaintiffs' claims for permanent injunctive relief are asserted as a nationwide class claim pursuant to Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) was specifically intended to be utilized in civil rights cases where plaintiffs seek injunctive relief for their own benefit and that of a class of similarly situated individuals.  To that end, the note to the 1996 amendment to Rule 23 states:

> Subdivision(b)(2).  This subdivision is intended to reach situations where a party has taken action or refused to take

> action with respect to a class, and final relief of an
> injunctive nature or a corresponding declaratory nature,
> settling the legality of the behavior with respect to the
> class as a whole, is appropriate . … Illustrative are various
> actions in the civil rights field where a party is charged
> with discriminating unlawfully against a class, usually one
> whose members are incapable of specific enumeration.

19. In addition, Plaintiffs' claims for statutory damages pursuant to Cal. Civ. Code §§ 52(a) and 54.3 are asserted as a California-only class claim pursuant to Fed. R. Civ. P. 23(b)(3).

20. For the foregoing reasons, Plaintiffs bring this action individually and on behalf of all others similarly situated based on Defendants' unlawful conduct, seeking damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for violation of: (1) Title III of the ADA, 42 U.S.C. §§ 12101, *et seq*.; (2) California's Unruh Act, Cal. Civ. Code §§ 51, *et seq*.; and (3) the CDPA, Cal. Civ. Code §§ 54, *et seq*.

## THE PARTIES

21. **Plaintiff D.P.** ("D.P.") is a natural person and a citizen of California, residing in Long Beach, California. D.P. has physical impairments that substantially limit several major life activities, including severe arthritis in her knees and irritable bowel syndrome ("IBS"). As a result, D.P. experiences chronic swelling and physical pain in her legs; has limited mobility; is unable to remain standing for a significant amount of time; has difficulty walking extensive distances; and must be able to urgently access restrooms at a moment's notice and without delay, among other limitations. These physical and mental impairments therefore substantially limit several "major life activities," 42 U.S.C. § 12102(2)(A), including, *inter alia*, D.P.'s ability to perform manual tasks, walk, stand, and bend. *See id*. Additionally, D.P.'s impairments impede the "operation of a major bodily function," 42 U.S.C. § 12102(2)(B), including but not limited to D.P.'s "functions of the … digestive[ and]

bowel," *id*., as well as her musculoskeletal functions, *see* 29 C.F.R. § 1630.2(h)(1), (i)(1)(ii).  D.P.'s impairments are therefore disabilities protected by the ADA, Unruh Act, and CDPA.  *See* 42 U.S.C. § 12102(1)-(2); *see also* Cal. Gov't Code § 12926.1(c); *id*. § 12926(j)(1)(C); *id*. § 12926(m)(1)(B)(iii).

22.    On or around September 28, 2023, D.P. applied for accommodations at Universal Studios Hollywood in California, by submitting an application through the IBCCES website, which included (per IBCCES rules) a mandatory disclosure of sensitive personal information and submission of medical documentation, in accordance with IBCCES's requirements.  Specifically, D.P. submitted a screenshot from her account on the Kaiser Permanente website showing, *inter alia*, her medical identification number, date of birth, and a list of medical diagnoses, including her arthritis and IBS diagnoses.  Following registration through the IBCCES website, D.P. received an IBCCES Individual Accessibility Card ("IAC"), as is required for disabled persons to partake in Universal's Attractions Assistance Program.  Thereafter, D.P. visited Universal Studios Hollywood on or around October 8, 2023, for Defendants' annual Halloween-themed event, Halloween Horror Nights.

23.    **Plaintiff F.C.** ("F.C.") (together with Plaintiff D.P., "Plaintiffs") is a natural person and a citizen of California, residing in La Verne, California.  F.C. has several physical and mental impairments that substantially limit several major life activities, including diabetes and Autism Spectrum Disorder ("ASD" or "autism").  As a result, F.C. experiences chronic physical pain, especially in his feet, legs, and lower torso; is unable to remain standing for a significant amount of time; has difficulty walking extensive distances; experiences heightened sensitivity to crowds, noise, and touch, among other limitations.  These physical and mental impairments therefore substantially limit several "major life activities," 42 U.S.C. § 12102(2)(A), including F.C.'s ability to independently care for himself, perform manual tasks, walk, stand, bend, concentrate, think, communicate, and work.  *See id*.  Additionally, F.C.'s impairments impede "operation of [several] major bodily function[s]," 42

U.S.C. § 12102(2)(B), including, but not limited to, F.C.'s endocrine, circulatory, musculoskeletal, cardiovascular, bladder, and brain functions.  *See id*.; 29 C.F.R. § 1630.2(h)(1), (i)(1)(ii).  F.C.'s impairments are therefore disabilities protected by the ADA, Unruh Act, and CDPA.  *See* 42 U.S.C. § 12102(1)-(2); *see also* Cal. Gov't Code § 12926.1(c); *id*. § 12926(j)(1)(C); *id*. § 12926(m)(1)(B)(iii).

24.    F.C. was a "Gold Annual Pass" season ticket[5] holder during the 2023-2024 season at Universal Theme Parks.  On or around January 12, 2024, F.C. visited Universal Studios Hollywood in California.  He arrived to the Park using a motorized scooter to assist with his mobility issues caused by diabetes-related nerve damage and resulting chronic pain, which includes sudden burning in the feet and legs.  F.C. sought necessary and reasonable accommodations in-person upon arrival to Universal on the day of his park visit.  Specifically, after entering the Park, F.C. navigated immediately to Guest Services inside the Park, where he requested necessary accommodations, including attraction queue accommodations, and an Attraction Access Pass (formerly called the "Guest Assistance Pass") reflecting the same.  However, Defendants refused to issue an Attraction Access Pass or Guest Assistance Pass, or otherwise entertain his request for accommodations.  Defendants' representatives explained to F.C. that, per Universal's new policy, guests requesting an attraction queue accommodation <u>must</u> obtain the IBCCES Individual Accessibility Card by registering with the IBCCES website at least 48

---

[5] *See* Universal Studio Hollywood, *Pass Types and Benefits*, https://www.universalstudioshollywood.com/web/en/us/pass-members/pass-types-and-benefits (detailing benefits of Universal's "Gold Annual Pass"); *see also* Creepy Kingdom, *Universal Studios Hollywood Invites Guests to Become Annual Pass Members and Unlock Exclusive Benefits* (Feb. 28, 2024), https://www.creepykingdom.com/post/universal-pass ("Gold Annual Pass: Visit Universal Studios Hollywood for over 325 days of the year, including complimentary General Parking (valid only for entry until 6pm), invites to special Pass Member events, 15% discount on food, beverage and merchandise at participating in-Park locations, 10%-15% discounts on food and shopping at participating Universal CityWalk locations and discounts on Halloween Horror Nights tickets.").

hours prior to their visit to the park, and that only IBCCES can issue the IBCCES Accessibility Card, not Universal Studios Hollywood.  Thus, because F.C. failed to satisfy that advanced registration requirement before arriving to the Park, Universal would not issue any such pass or consider his request for accommodations in connection with F.C.'s January 12, 2024 park visit.  As F.C. learned, by the time he arrived to the Park, it was already too late.

25.     Furthermore, due to privacy and dignity concerns, F.C. is not willing to register with IBCCES or submit a request for accommodations through the IBCCES website in advance of any future park visits.  Yet, F.C. wants and intends to continue visiting Universal in the future, as he loves amusement parks and Universal Studios Hollywood is located reasonably nearby his place of residence in Los Angeles County.  That said, F.C. would like to visit Universal in the future *without suffering discrimination in any form*, as is his unqualified right under state and federal law.  But, currently, under Defendants' blanket policy, that is not possible.  On one hand, if F.C. does not comply with the pre-registration requirement and apply for accommodations through the IBCCES website in advance of his next Park visit, he will once again be denied necessary and reasonable accommodations required for F.C. to fully use and enjoy Defendants' facilities, services, goods, and accommodations at Universal.  On the other hand, if he *does* comply with Defendants' pre-registration and documentation requirements, F.C. will have been relegated to separate, unequal, and lesser treatment at the Park as compared to nondisabled persons – who may purchase their tickets for admission to Universal in-person at the Park, on the same day of their park visits, and may then enter the Parks and enjoy all the benefits on offer, without any advance planning or preparation – and he will also suffer irreparable harm to his legitimate dignity and/or privacy interests as a result of Defendants' unnecessary, burdensome, and unlawful request for documentation substantiating F.C.'s disabilities.  Thus, in either case, Defendants' current disability access policies are discriminatory.

26.     Indeed, as explained in detail below, in the case of both Plaintiffs, Defendants' procedure for requesting accommodations for requesting accommodations at the Amusement Parks through the IBCCES website resulted, and continues to result, in the widespread denial of Plaintiffs' and Class Members' full and free use of the Park facilities.

27.     **Defendant NBCUniversal Media, LLC** ("NBCUniversal") is a limited liability company organized under the laws of the state of Delaware, with its principal place of business located at 30 Rockefeller Plaza, New York, New York 10112.  NBCUniversal is an American multinational mass media and entertainment conglomerate that owns and operates, *inter alia*, the National Broadcasting Company ("NBC"), one of the "Big Three" television networks in the United States, and Universal Pictures, a major Hollywood film studio.  Further, relevant to Plaintiff's claims, acting alone or in concert with others, NBCUniversal, via its Universal Destinations & Experiences division,[6] owns and operates Universal theme parks and resort properties around the world, including "Universal Studios Hollywood," a theme park located in Universal City, California, as well as "Universal Orlando Resort," a theme park and entertainment resort complex located in Orlando, Florida (collectively, "Universal Studios Theme Parks," "Universal Theme Parks," the "Amusement Parks," or "Parks").  In fact, with approximately 32,025,000 visitors across all Universal Theme Parks located in the United States in

---

[6] "Universal Destinations & Experiences is the theme park unit of NBCUniversal." *Wynn-Warren v. Universal City Studios LLC et al*, No. 2:19-cv-08124, ECF No. 1 (C.D. Cal. Sep. 19, 2019) (Notice of Removal) ¶ 27; *see also* Universal Studios Hollywood, *About Us*, https://www.universalstudioshollywood.com/web/en/us/about-us ("Universal Studios Hollywood is a unit of Universal Parks & Resorts, a division of NBCUniversal."); NBCUniversal, *Our Theme Parks*, https://www.nbcuniversal.com/environment/our_theme_parks ("Universal Destinations & Experiences welcomes millions of visitors every year at its Universal Orlando Resort and Universal Studios Hollywood vacation destinations."); NBCUniversal, *About NBCUniversal*, https://www.nbcuniversal.com/about ("We own and operate … world-renowned theme parks and attractions through Universal Destinations & Experiences.").

---

2022, Universal Theme Parks rank among the most visited amusement parks in the world.[7]  Further, via its Universal Destinations & Experiences division, NBCUniversal was (at least as of 2017) the third-largest operator of amusement parks in the world.[8]  In its capacity as a theme park owner and operator, NBCUniversal has done business in California and Florida and throughout the United States at all times during the Class Period.  Further, NBCUniversal is a "private entity" within the meaning of the ADA, *see* 42 U.S.C. § 12181(6) ("The term 'private entity' means any entity other than a public entity[.]"), and its facilities—the Amusement Parks—are places of "public accommodation," *see id.* § 12181(7)(I) ("The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce … (I) a park, zoo, **amusement park**, or other place of recreation ….") (emphasis added); *accord* 28 C.F.R. § 36.104 (same).[9]

---

[7] *See 2022 Global Attractions Attendance Report*, *supra*, at 14-15, 33.

[8] *See* TEA/AECOM, *2017 Theme Index and Museum Index: The Global Attractions Attendance Report* (May 17, 2018), *available at* https://web.archive.org/web/20180519000915/http://www.teaconnect.org/images/files/TEA_268_653730_180517.pdf (archived from original on May 19, 2018).

[9] *See also, e.g.*, *Castelan v. Universal Studios Inc.*, 2014 WL 210754, at *5 n.6 (C.D. Cal. Jan. 10, 2014) ("Universal Studios theme park is indisputably a place of public accommodation.  The statute explicitly mentions 'amusement park' as an example.") (citing 42 U.S.C. § 12181(7)(I)); *accord Davis v. SeaWorld Parks & Ent., Inc.*, 2023 WL 4763451, at *8 (M.D. Fla. July 25, 2023) ("SeaWorld's theme park constitutes a 'public accommodation' as defined in the ADA."); *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 469 F. Supp. 3d 1280, 1302 (M.D. Fla. 2020), *aff'd*, 50 F.4th 1097 (11th Cir. 2022); *Galvan v. Walt Disney Parks & Resorts, U.S., Inc.*, 425 F. Supp. 3d 1234, 1239 (C.D. Cal. 2019) ("Places of public accommodation, like Disneyland, must 'provide disabled patrons an experience comparable to that of able-bodied patrons.'") (citation omitted); *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1215 (11th Cir. 2012); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012); *LaBonte v. Riverside Park Enterprises, Inc.*, 2022 WL 17253663, at *3 (D. Mass. Nov. 28, 2022); *Masci v. Six Flags Theme Park, Inc.*, 2014 WL 7409952, at *9 (D.N.J. Dec. 31, 2014); *Bench v. Six Flags Over Texas, Inc.*, 2014 WL 12586743, at *8 (N.D. Tex. July 7, 2014).

---

28.     Thus, as the owner and operator of the Amusement Parks, NBCUniversal is subject to Title III of the ADA.  *See* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.").  Relevant to Plaintiffs' claims, since approximately July 2023, NBCUniversal, acting alone or in concert with others, has maintained a uniform policy and practice at both of its Amusement Parks in the United States regarding disability access that requires disabled persons seeking accommodations at the Parks to register with IBCCES, a for-profit private entity, in advance of their scheduled visits through a burdensome online application process that requires, *inter alia*, disclosure and submission of sensitive medical information and documentation not necessary for the verification, assessment, or provision of reasonable accommodations ensuring equal access, in violation of state and federal law.  At all relevant times, acting alone or in concert with others, NBCUniversal formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

29.     **Defendant Universal City Studios LLC** d/b/a Universal Studios Hollywood ("Universal Studios Hollywood") is a limited liability company organized under the laws of the state of Delaware, with its principal place of business located at 100 Universal City Plaza, Universal City, California 91608. Universal Studios Hollywood is a division and wholly owned subsidiary of NBCUniversal, and it has done business in California and throughout the United States at all times during the Class Period.[10]  Specifically, at all relevant times,

[10] *See Wynn-Warren v. Universal City Studios LLC et al*, No. 2:19-cv-08124, ECF No. 1 (C.D. Cal. Sep. 19, 2019) (Notice of Removal) ¶ 27 ("'Universal Theme Parks' is the theme park division of Defendant NBCUniversal Media, LLC. Universal Studios Hollywood is … the name of a theme park operated by Defendant NBCUniversal Media, LLC and is a registered dba of Universal City Studios

acting alone or in concert with Defendants NBCUniversal and Universal Studios LLC, NBCUniversal has owned and operated "Universal Studios Hollywood," a theme park located in Universal City, California (the "California Park" or "Universal Hollywood").  Universal Studios Hollywood is a "private entity" within the meaning of the ADA, *see* 42 U.S.C. § 12181(6), and its California Park facility is a place of "public accommodation," *see id*. § 12181(7)(I); *accord* 28 C.F.R. § 36.104 (same).  Universal Studios Hollywood is thus subject to Title III of the ADA, *see* 42 U.S.C. § 12182(a).

30.    **Defendant Universal City Development Partners, Ltd.** d/b/a Universal Orlando Resort ("Universal Orlando") is a Delaware limited liability company with its principal place of business located at 1000 Universal Studios Plaza, Orlando, Florida  32819.  Universal Orlando is a wholly owned subsidiary of NBCUniversal, and it has done business in Florida and throughout the United States at all times during the Class Period.  Specifically, at all relevant times, acting alone or in concert with Defendant NBCUniversal, Universal Orlando has owned and operated "Universal Orlando Resort," a theme park and resort located in Orlando, Florida (the "Florida Park").[11]  Universal Orlando is a "private entity" within the meaning of the ADA, *see* 42 U.S.C. § 12181(6), and the Florida Park facility, an amusement park, is a place of "public accommodation," *see id*. § 12181(7)(I);

---

LLC."); *see also* Bloomberg, Company Profile for Universal City Studios LLC, https://www.bloomberg.com/profile/company/0750436D:US (last accessed Feb. 20, 2024) ("Universal City Studios LLC operates as an entertainment company.  The Company produces and distributes motion pictures and television programs, as well as … theme parks … and other related services.  Universal City Studios serves customers in the United States.").

[11] *See* Bloomberg, Company Profile for Universal City Development Partners Ltd, https://www.bloomberg.com/profile/company/651306Z:US (last accessed Feb. 21, 2024) ("Universal City Development Partners, Ltd., doing business as Universal Orlando Resort, owns and operates entertainment theme parks.  The Company offers a range of rides, live shows, dining, movie theaters, hotels, and gift and merchandise shops.  Universal Orlando Resort serves customers in the United States.").

*accord* 28 C.F.R. § 36.104 (same).  Universal Orlando is thus subject to Title III of the ADA, *see* 42 U.S.C. § 12182(a).

31.     **Defendant Universal City Travel Partners** d/b/a Universal Parks & Resorts Vacations ("Universal Travel") is a Delaware limited liability company with its principal place of business located at 1000 Universal Studios Plaza, Orlando, Florida  32819.  Universal Travel is a wholly owned subsidiary of NBCUniversal that "operates as a tour operator and sells wholesale travel packages.  The Company specializes in the creation, operation, and marketing of theme parks and entertainment centers,"[12] including the Universal Theme Parks.  Universal Travel serves customers, and has done business, in and throughout the United States at all times during the Class Period, including in Florida and California.[13]  Specifically, at all relevant times, acting alone or in concert with others, Universal Travel owns and operates the Universal Theme Parks.  Universal Travel is subject to Title III of the ADA, *see* 42 U.S.C. § 12182(a), because it is a "private entity" within the meaning of the ADA, *see* 42 U.S.C. § 12181(6), and the Universal Theme Parks are places of "public accommodation," *see id*. § 12181(7)(I); *accord* 28 C.F.R. § 36.104 (same).

32.     Relevant to Plaintiffs' claims, since approximately July 2023, Defendants NBCUniversal, Universal Studios Hollywood, Universal Orlando, and Universal Travel (collectively, "Defendants" or "Universal"), acting alone or in concert with each other, have maintained a uniform policy and practice regarding disability access at each of their Amusement Parks that requires disabled persons seeking accommodations at the Parks to register with IBCCES, a for-profit private entity, in advance of their scheduled visits through a burdensome online application process that requires, *inter alia*, disclosure and submission of sensitive medical

---

[12] Bloomberg, Company Profile for Universal City Travel Partners, https://www.dnb.com/business-directory/company-profiles.universal_city_travel_partners.c82ac8d839a89e97d7decb2f3f0af504.html.

[13] *See id*. ("Universal City Travel Partners, doing business as Universal Parks & Resorts Vacations, … serves customers in the United States.")

information and documentation not necessary for the verification, assessment, or provision of reasonable accommodations ensuring equal access, in violation of state and federal law.  At all relevant times, Defendants, acting alone or in concert with each other, formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

33.   Defendants wholly own and operate the Amusement Parks and are responsible for the creation, implementation, and administration of the Attraction Assistance Program, as well as for the training of Park employees.  Defendants have sold, and continue to sell, tickets to their Amusement Parks in California and Florida to individuals throughout the United States at all times during the Class Period.

34.   Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, and/or conspired in the discriminatory and unlawful alleged herein.

## JURISDICTION AND VENUE

35.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises directly under the "laws[] … of the United States"—namely, Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., and its implementing regulations—and thus raises a federal question. For the same reason, this Court also has subject matter jurisdiction under 28 U.S.C. § 1343(a)(4) ("The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: … (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights[.]").  In addition, this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

36.   This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this is a class action where the aggregate claims for all members

of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and there is at least minimal diversity in that most members of the proposed classes are citizens of a state different from most Defendants.

37.     This Court has personal jurisdiction over the parties because Defendants have, at all times relevant hereto, systematically and continually conducted, and continue to conduct, business in California.  Indeed, Defendants maintain an amusement park in this State—Universal Studios Hollywood. Defendants therefore have sufficient minimum contacts with this State and/or have intentionally availed themselves of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout California, such that they should reasonably expect to be brought into court in this State and District as a result of their activities here.  Additionally, Defendant Universal Studios Hollywood is an "unincorporated association" under CAFA, and it is therefore a "citizen[] of the State where [it has its] principal place of business [California] and the State under whose laws [it is] organized [also California]."  28 U.S.C. § 1332(d)(10).  Thus, this Court has general personal jurisdiction over Defendant Universal Studios Hollywood because it maintains its principal places of business in California and is therefore "essentially at home" in this State.  *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  Further, Plaintiffs reside in California, are citizens of California, registered for their IBCCES Accessibility Cards at issue from California, purchased their park tickets to Universal Studios Hollywood from California, visited Defendants' facility in California, suffered injury in California, and submit to the jurisdiction of this Court.

38.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the

claims herein occurred in this District.  Also, Defendant Universal Studios Hollywood maintains its principal places of business in this District, and Plaintiffs both reside in this District.  Moreover, Defendants systematically conduct business in this District and throughout the State of California.

### FACTUAL BACKGROUND

**A.    Overview Of Federal And State Laws Prohibiting Discrimination On The Basis Of Disability**

**i.    Title III of the ADA**

39.    In 1990, the United States Congress made findings that laws were needed to more fully protect "some 43 million Americans [with] one or more physical or mental disabilities;" that "historically society has tended to isolate and segregate individuals with disabilities;" that "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;" that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living and economic self sufficiency for such individuals;" and that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous."  42 U.S.C. § 12101.

40.    Title III of the ADA prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (General Rule).

41.    To aid in the construction of this rule under Section 12182(a), the ADA sets forth several general prohibitions relevant to Plaintiffs' claims:

**(b) CONSTRUCTION**

**(1) GENERAL PROHIBITION**

**(A) Activities**

**(i) Denial of participation**
It shall be discriminatory to subject an individual or class of individuals on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity.

**(ii) Participation in unequal benefit**
It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

**(iii) Separate benefit**
It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others. …

**(D) Administrative methods**
An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration—
(i) that have the effect of discriminating on the basis of disability;

or

1

2

(ii) that perpetuate the discrimination of others who are subject to common administrative control.

3

42 U.S.C. §§ 12182(b)(1)(A)(i)-(iii), 12182(b)(1)(D).  The general prohibitions cited

4

above are supplemented by various, more specific requirements.[14]

5

  42. Particularly relevant here, public accommodations: (1) may not impose

6

"eligibility criteria" that tend to screen out disabled individuals, 42 U.S.C. §

7

12182(b)(2)(A)(i) (prohibiting "the imposition or application of eligibility criteria

8

that screen out or tend to screen out an individual with a disability or any class of

9

individuals with disabilities from fully and equally enjoying any goods, services,

10

facilities, privileges, advantages, or accommodations"); and (2) must make

11

"reasonable modifications in polices, practices, or procedures, when such

12

modifications are necessary" to provide disabled individuals full and equal

13

enjoyment, *id*. § 12182(b)(2)(A)(ii) (prohibiting "a failure to make reasonable

14

modifications in policies, practices, or procedures, when such modifications are

15

necessary to afford such goods, services, facilities, privileges, advantages, or

16

accommodations to individuals with disabilities"); *accord* 28 C.F.R. § 36.302(a) ("A

17

public accommodation shall make reasonable modifications in policies, practices, or

18

procedures, when the modifications are necessary to afford goods, services,

19

facilities, privileges, advantages, or accommodations to individuals with disabilities

20

….").

21

  43. Further, in enacting the ADA, Congress explained that one purpose is

22

"to ensure that the Federal Government plays a central role in enforcing the

23

standards established in this chapter."  42 U.S.C. § 12101(b)(3).  To that end,

24

25

26

27

28

---

[14] The specific requirements and prohibitions of "subsection (b)(2)(A) [of Section 12182], by its clear terms, provides a <u>non-exhaustive, illustrative list</u> of certain actions that qualify as discrimination."  *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1011-12 (9th Cir. 2017) (emphasis added, citation omitted); *see also Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 128-29 (2005) (noting that the general non-discrimination rule in subsection (a) is "supplemented by various, more specific requirements," such as those found in subsection (b)(2)(A)).

Congress gave the Attorney General the responsibility to promulgate regulations implementing the provisions of Title III of the ADA.  *See* 42 U.S.C. § 12186(b).  "To flesh out the details of [Title III's] general rule, Congress charged the Attorney General with the task of promulgating regulations clarifying how public accommodations must meet these statutory obligations."  *United States v. AMC Ent., Inc.*, 549 F.3d 760, 763 (9th Cir. 2008).  Several of these implementing regulations are relevant to Plaintiff's claims.  *See, e.g.*, 28 C.F.R. § 36.302 (addressing "[m]odifications in policies, practices, or procedures").

44.     Title III implementing regulations plainly prohibit public accommodations from making any inquiries about the existence of a guest's disability, let alone the specific abilities or limitations the guest may have.  *See* 28 C.F.R. § 36.302(c)(6) ("**A public accommodation shall not ask about the nature or extent of a person's disability … [and] shall not require documentation**[.]") (emphasis added); *see also id.* §  36.302(f)(8) ("**A public accommodation may not require proof of disability, including, for example, a doctor's note, before selling tickets for accessible seating.**"); *id.* § 36.311(c)(1) ("**A public accommodation shall not ask an individual using a wheelchair or other power-driven mobility device questions about the nature and extent of the individual's disability.**").  *See also Davis v. SeaWorld Parks & Ent., Inc.*, 2023 WL 4763451, at *10 (M.D. Fla. July 25, 2023); *A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 469 F. Supp. 3d 1280, 1308 (M.D. Fla. 2020), *aff'd*, 50 F.4th 1097 (11th Cir. 2022); *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1291 (11th Cir. 2018); *Garneaux v Kym Ventures LLC*, 2018 WL 8131765 (N.D. Ga. Sept. 6, 2018) (citing and applying 28 C.F.R. § 36.302(c)(6)); *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *8 (C.D. Cal. Feb. 12, 2014) ("[T]he regulation [under 28 C.F.R. § 36.302(c)(6)] prohibits all inquiries regarding the nature or extent of a person's disability other than the two exceptions specified [in that section]. … [T]his regulation precludes law enforcement and personnel such as

[defendant] from investigating whether purported [disabilities] … are what [individuals requesting accommodations] say they are.") (emphasis added); *id.* ("[T]his provision plainly prohibits all inquiries other than the two permitted inquiries, while also limiting the permitted inquiries to [specific] situations[.]").

45.    As courts applying 36.302(c)(6) have explained, "[t]his 'regulation [] protects individuals with disabilities from possibly unwanted questioning.'" *Davis*, 2023 WL 4763451, at *10 (quoting *Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1356 (S.D. Fla. 2015)).

46.    To be sure, notwithstanding the general rule announced by 28 C.F.R. § 36.302(c)(6), in certain specific contexts, the implementing regulations permit some sort of **limited** inquiry (*i.e.*, a simple inquiry that does *not* require "screening" or the submission of sensitive medical information or documentation) for verification purposes.  *See*, *e.g.*, 28 C.F.R. § 36.302(f)(8)(i) ("For the sale of single-event tickets, it is permissible to inquire whether the individual purchasing the tickets for accessible seating has a mobility disability or a disability that requires the use of the accessible features that are provided in accessible seating, or is purchasing the tickets for an individual who has a mobility disability or a disability that requires the use of the accessible features that are provided in the accessible seating.") (emphasis added); *id.* § 36.302(f)(8)(ii) ("For series-of-events tickets, it is permissible to ask the individual purchasing the tickets for accessible seating to attest in writing that the accessible seating is for a person who has a mobility disability or a disability that requires the use of the accessible features that are provided in the accessible seating.") (emphasis added); *id.* § 36.302(f)(8)(iii) ("A public accommodation may investigate the potential misuse of accessible seating where there is good cause to believe that such seating has been purchased fraudulently.") (emphasis added); *id.* § 36.302(c)(6) ("A public accommodation … may make two [limited] inquiries to determine whether an animal qualifies as a service animal[] … [but, g]enerally, a public accommodation may not make these inquiries … when it is readily apparent

that an animal is trained to do work or perform tasks for an individual with a disability (e.g., the dog is observed guiding an individual who is blind or has low vision, pulling a person's wheelchair, or providing assistance with stability or balance to an individual with an observable mobility disability).") (emphasis added); *id*. § 36.311(c)(2).

47. However, even under these exceptional instances, where the ADA anticipates that further inquiry and/or documentation may be required to ascertain whether a requested accommodation is reasonable and necessary, the ADA still does not permit a public accommodation to engage in a free-wheeling assessment or require, as a blanket matter, all patrons seeking accommodation to disclose their disabilities or provide proof of impairment through submission of sensitive medical documentation.[15]  In any case, none of the specific exceptions to the general rule announced under 28 C.F.R. § 36.302(c)(6), "prohibit[ing] all inquiries regarding the nature or extent of a person's disability," *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *8 (C.D. Cal. Feb. 12, 2014), are applicable here.

---

[15] For instance, with respect to requests for accommodations in the context of examinations and courses, the implementing regulations are clear that "[a]ny request for documentation, if such documentation is required, is reasonable and <u>limited to the need for the modification, accommodation, or auxiliary aid or service requested</u>." 28 C.F.R. § 36.309(b)(1)(iv) (emphasis added).  This regulation has two critical implications.  First, it constrains the timing of a documentation request.  That is, by limiting such requests to documentation supporting "the need for the … accommodation … requested," *id*., Section 36.309(b)(1)(iv) indicates that the request for documentation must follow, and not precede, the request for accommodation.  Otherwise, the documentation request could not be limited to needs relevant to the accommodation request.  Second, any such inquiry must be based on an individualized assessment of the given circumstances concerning a specific accommodation request addressing a particular impairment.  In other words, by mandating the public accommodation's documentation request to be tailored to the particular accommodation requested, Section 36.309(b)(1)(iv) necessarily requires that documentation requests be made on a case-by-case basis.  As a result, a blanket policy requiring that all disabled patrons provide a specific form of medical documentation simultaneously with their accommodation requests, and without regard to the particular impairment at issue or accommodation sought, constitutes an unlawful inquiry under the ADA.

---

48.     And even if an exception applied such that a limited request for proof of disability *is* permitted under the ADA (that is not the case), the implementing regulations are clear that a public accommodation must be flexible with respect to the form such proof may take.  For instance, 28 C.F.R. § 36.311(c)(2) states that "[a] public accommodation may ask a person using an other power-driven mobility device to provide a credible assurance that the mobility device is required because of the person's disability."  However, in that case, Section 36.311(c)(2) provides the following limitations on any such inquiry:

> A public accommodation may ask a person using an other power-driven mobility device to provide a credible assurance that the mobility device is required because of the person's disability.  A public accommodation that permits the use of an other power-driven mobility device by an individual with a mobility disability <u>shall accept the presentation of a valid, State-issued disability parking placard or card, or State-issued proof of disability, as a credible assurance that the use of the other power-driven mobility device is for the individual's mobility disability</u>. <u>In lieu of a valid, State-issued disability parking placard or card, or State-issued proof of disability, **a public accommodation shall accept as a credible assurance a verbal representation**, not contradicted by observable fact, that the other power-driven mobility device is being used for a mobility disability</u>….

28 C.F.R. § 36.311(c)(2) (emphasis added).  Thus, owners, lessors, and operators of places of public accommodations may not limit proof of disability to specific categories of documentation, to the exclusion of others – such as a "statement from medical provider"[16] – where other forms of proof, like a "valid, State-issued disability parking placard or card, or … a verbal representation" (*id*. § 36.311(c)(2)), would suffice.  A "request for documentation" pursuant to such a rigid policy would

---

[16] Universal Studios Hollywood, *FAQs: Accessibility Information*, https://www.universalstudioshollywood.com/web/en/us/faqs/accessibility-information.

not be "reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested." *Id*. § 36.309(b)(1)(iv).

49.     Further, DOJ regulations provide, in relevant part, that "[a] public accommodation that sells tickets for a single event or series of events shall modify its policies, practices, or procedures to ensure that individuals with disabilities have an equal opportunity to purchase tickets for accessible seating[] … [d]uring the same hours; … [t]hrough the same methods of distribution; … [i]n the same types and numbers of ticketing sales outlets, including telephone service, in-person ticket sales at the facility, or third-party ticketing services, as other patrons; and [u]nder the same terms and conditions as other tickets sold for the same event or series of events." 28 C.F.R. § 36.302(f)(1)(ii).[17] Thus, where non-disabled individuals are able to spontaneously purchase tickets to an event upon arrival at the facility, without prior planning, a place of public accommodation must afford disabled persons that same luxury.

50.     The DOJ's commentary accompanying its rulemaking confirms that a covered entity must assess accommodation requests on a case-by-case basis, taking into account, *inter alia*, the specific accommodation sought.  *See, e.g.*, *Accommodations and in Commercial Facilities* ("Final Rule"), 75 Fed. Reg. 56236, 56236 (Sep. 15, 2010) (codified at 28 C.F.R. part 36) ("When a person has [an ADA-qualifying] disability, a covered entity may have to make reasonable modifications in its policies and practices for that person.  However, this determination is an individual assessment and must be made on a case-by-case basis.");  *id*. at 56294 ("[T]he case-specific factors underlying the statute's readily

---

[17] In the same vein, Section 36.302(e)(1)(i) provides that "[a] public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party—(i) Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms[.]"  28 C.F.R. § 36.302(e)(1)(i) (emphasis added).

achievable standard cannot be reconciled with a formulaic accounting approach, and [] a blanket formula inherently is less fair, less flexible, and less effective than the current case-by-case determination for whether an action is readily achievable."); *see also id*. at 56297 ("[In the context of accommodations requests made in testing and examination settings, [t]he Department believes that appropriate documentation may vary depending on the nature of the disability and the specific modification or aid requested, and accordingly, [] entities should consider a variety of types of information[.]").

51.    Further, in expressly prohibiting places of public accommodation from "requir[ing] documentation," the DOJ observed that requiring individuals with disabilities to provide medical documentation in every case and without regard to the specific accommodation requested and other fact-specific circumstances "**would be unnecessary, burdensome, and contrary to the spirit, intent, and mandates of the ADA**." *Id*. at 56272 (emphasis added); *see also, e.g.*, *id*. at 56300 (Sep. 15, 2010) (codified at 28 C.F.R. part 36) ("A public accommodation shall not ask a person using a mobility device questions about the nature and extent of the person's disability.") (citing 73 FR 34508, 34556 (June 17, 2008)); *see also id*. (acknowledging "the Department's **longstanding, well-established policy of not allowing public accommodations or establishments to require proof** of a mobility disability" and noting that "the privacy of individuals with mobility disabilities and respect for those individuals are [] vitally important") (emphasis added).

52.    Thus, the DOJ regulations, rulemaking commentary, and guidance documents have consistently rejected a formalistic process for making and assessing accommodation requests.

53.    As explained in detail below, Defendants uniformly violate Sections 12182(a) (general rule), 12182(b)(1)(A)(i) (denial of participation), 12182(b)(1)(A)(ii) (participation in unequal benefit), 12182(b)(1)(A)(iii) (separate

benefit), 12182(b)(1)(D) (administrative methods), 12182(b)(2)(A)(i) (eligibility criteria), and 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices, or procedures) of the ADA, as well as the ADA's implementing regulations set forth under, *inter alia*, 28 C.F.R. § 36.302.

### ii. California Law Protecting Disability Access

54. "In California, '[t]wo overlapping laws, the Unruh Civil Rights Act (§ 51) and the Disabled Persons Act (§§ 54-55.3), are the principal sources of state disability access protection.'" *Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 305 (2021), *review denied* (Dec. 22, 2021) (quoting *Jankey v. Lee*, 55 Cal. 4th 1038, 1044 (2012)).

### California's Unruh Civil Rights Act

55. Section 51(b) of the California Civil Code, known as the "Unruh Civil Rights Act" (the "Unruh Act"), provides protection from discrimination by all business establishments in California, including public accommodations, and prohibits discrimination on the basis of, *inter alia*, disability. Specifically, Section 51(b) provides that:

> All persons within the jurisdiction of this state are free and equal, and no matter what their … disability [or] medical condition … are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b).

56. Pursuant to Section 51(f) of the Unruh Act, "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall [] constitute a violation of this section." Cal. Civ. Code § 51(f). "[A]n Unruh [ ] Act claimant … need not prove intentional discrimination upon

establishing an ADA violation[.]"  *Thurston v. Omni Hotels Mgmt. Corp.*, 69 Cal. App. 5th 299, 309 (2021), *review denied* (Dec. 22, 2021).[18]

57.     Private citizens may enforce the Unruh Act, as the California Legislture has provided a private right of action.  *See* Cal. Civ. Code § 52(c) ("Whenever there is reasonable cause to believe that any person or group of persons is engaged in conduct of resistance to the full enjoyment of any of the rights described in this section, and that conduct is of that nature and is intended to deny the full exercise of those rights, … any person aggrieved by the conduct may bring a civil action in the appropriate court by filing with it a complaint."); *id.* § 52(e) ("Actions brought pursuant to this section are independent of any other actions, remedies, or procedures that may be available to an aggrieved party pursuant to any other law.").

58.     Where an aggrieved person brings a civil action in court pursuant to the Unruh Act, the "complaint shall contain … [a] request for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the complainant deems necessary to ensure the full enjoyment of the rights described in this section."  Cal. Civ. Code § 52(c)(3).

59.     Further, Section 52(a) authorizes aggrieved persons to obtain statutory damages "for each and every" Unruh Act violation, as follows:

---

[18] *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 678 & n.13 (2009) ("The 2008 Legislature was informed—and may be presumed to have been aware—that <u>damages under the Unruh [ ] Act might be awarded for denial of ADA mandated access without proof of intentional discrimination</u>. … Yet, … the reform approach the Legislature ultimately chose did not include requiring such … proof of intent to discriminate. … <u>Even if we agreed with defendant that adding an intent requirement to the Unruh [ ] Act would be warranted to curb abuse, we would not be free to substitute our own judgment for that of the Legislature</u>.") (emphasis added, internal footnote omitted); *see also* Senate Committee on the Judiciary, *Analysis of Senate Bill No. 1608 (2007–2008 Reg. Sess.) as amended April 21, 2008*, page 7 (noting that in the context of an ADA violation, federal case law "provides that a plaintiff is not required to show intentional discrimination in order to recover under Unruh"); Assembly Committee on the Judiciary, *Analysis of Senate Bill No. 1608 (2007–2008 Reg. Sess.) as amended May 27, 2008*, page 4 (same).

> Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51[] … is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but <u>in no case less than four thousand dollars ($4,000)</u>, and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51[.]

Cal. Civ. Code § 52(a) (emphasis added).

60.     As explained below, Defendants violate Section 51(b) of the Unruh Act by, *inter alia*, implementing, and failing to reasonably modify, the Attraction Assistance Program, which results in the widespread denial of the full and equal accommodations, advantages, facilities, privileges, and/or services in Defendants' business establishment to which disabled persons are entitled.  Defendants also violate Section 51(f) of the Unruh Act through their violations of the ADA under Sections 12182(a), 12182(b)(1)(A)(i), 12182(b)(1)(A)(ii), 12182(b)(1)(A)(iii), 12182(b)(1)(D), 12182(b)(2)(A)(i), and 12182(b)(2)(A)(ii), and of the ADA's implementing regulations under 28 C.F.R. §  36.302, as detailed below.

### The California Disabled Persons Act

61.     Pursuant to the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54, *et seq*., "[i]ndividuals with disabilities or medical conditions have the same right as the general public to the full and free use of … public buildings, … public facilities, and other public places."  Cal. Civ. Code § 54(a).  Defendants are subject to Section 54(a) because Plaintiffs have "disabilities" and/or "medical conditions" within the meaning of the CDPA, and Defendants' Amusement Parks are undeniably facilities open to the general public.

62.     The CDPA further provides that "[i]ndividuals with disabilities shall be entitled to <u>full and equal access</u>, as other members of the general public, to

accommodations, advantages, facilities, … and privileges of all … <u>places of public accommodation, amusement,</u> or resort, and other places to which the general public is invited[.]"  Cal. Civ. Code § 54.1(a)(1) (emphasis added).  For purposes of this section, the CDPA defines "'[f]ull and equal access'… [to] mean[] access that meets the standards of Title[] … III of the Americans with Disabilities Act of 1990 (Public Law 101-336)1 and federal regulations adopted pursuant thereto, except that, if the laws of this state prescribe higher standards, it shall mean access that meets those higher standards."  Cal. Civ. Code § 54.1(a)(3).

63.    Additionally, like the Unruh Act, the CDPA wholly incorporates ADA violations.  *See* Cal. Civ. Code § 54(c) ("A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section."); *see also* Cal. Civ. Code § 54.1(d) ("A violation of the right of an individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) also constitutes a violation of this section, and this section does not limit the access of any person in violation of that act.").

64.    Private citizens may enforce the CDPA, as the California Legislature has provided a private right of action.  *See* Cal. Civ. Code § 54.3(b).

65.    Section 54.3(a) of the CDPA authorizes aggrieved persons to obtain statutory damages in an amount not less than $1,000 for each CDPA violation.  Specifically, that section states, in relevant part, that "[a]ny person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in Sections 54 and 54.1 … or otherwise interferes with the rights of an individual with a disability under Sections 54[ and] 54.1 … is liable for each offense for the actual damages … up to a maximum of three times the amount of actual damages but <u>in no case less than one thousand dollars ($1,000),</u> and attorney's fees as may be determined by the court in addition thereto, suffered by any person denied any of the rights provided in Sections 54[ and] 54.1…."  Cal. Civ. Code § 54.3(a) (emphasis added).

66.    "A showing of intent is not required to obtain damages under the [CDPA]."  *Delgado v. Orchard Supply Hardware Corp.*, 826 F. Supp. 2d 1208, 1219 (E.D. Cal. 2011) (citing *Donald v. Cafe Royale, Inc.*, 218 Cal. App. 3d 168, 177-80 (1990)).

67.    Further, pursuant to Section 55 of the CDPA, "[a]ny person who is aggrieved or potentially aggrieved by a violation of Section 54 or 54.1 of this code[] … may bring an action to enjoin the violation.  The prevailing party in the action shall be entitled to recover reasonable attorney's fees."  Cal. Civ. Code § 55; *see also* Cal. Civ. Code § 54.3(b) ("The remedies in this section are nonexclusive and are in addition to any other remedy provided by law, including, but not limited to, any action for injunctive or other equitable relief available to the aggrieved party or brought in the name of the people of this state or of the United States.").

68.    As explained below, Defendants violated Sections 54(a) and 54.1(a)(1) of the CDPA because their procedure for requesting accommodations at the Amusement Parks through the IBCCES website resulted in the denial of Plaintiffs' full and free use of Defendants' physical Park facilities.  *See* Cal. Civ. Code §§ 54(a), 54.1(a)(1); *see also Turner v. Ass'n of Am. Med. Colleges*, 167 Cal. App. 4th 1401, 1412 (2008), *as modified on denial of reh'g* (Nov. 25, 2008) ("Civil Code section 54, subdivision (a) entitles disabled persons to 'full and free use' of 'public *places*.'") (emphasis added); *id*. ("[The CDPA's] <u>focus is upon *physical* access to public places, though the statute may also be construed as requiring equal physical access to a nontangible location such as an internet site</u>.") (italics in original; underlining added for emphasis; internal citations omitted) (quoting *Urhausen v. Longs Drug Stores California, Inc.*,155 Cal. App. 4th 254, 261 (2007)).[19]

_____

[19] That is, although "[n]othing in the language of section 54 can be reasonably construed to require a modification of the [disability access] procedures themselves" (*i.e.*, because the IBCCES registration process takes place online, in advance of a guest's Park visit), the CDPA nevertheless requires modification of this policy "<u>to the extent necessary to guarantee physical access to the place in which the [requested</u>

Defendants also violated Sections 54(c) and 54.1(d) of the CDPA vis-à-vis their ADA violations, as detailed below.  *See* Cal. Civ. Code §§ 54(c), 54.1(d).

**B.    Defendants' Disability Access Procedures**

69.    For more than 60 years, Universal has entertained millions of families with world-class coasters, themed rides, thrilling water parks, and unique attractions. Indeed, Defendants' Universal Studios Hollywood—a theme park in the San Fernando Valley area of Los Angeles County, California—was established in the 1960s, and it was the first of many full-fledged Universal Studios Theme Parks located across the world.  The popularity of Universal Studios Hollywood led Universal to build additional theme parks, including Universal Studios in Orlando, Florida, which opened in 1990.  With approximately 32,025,000 visitors across all Universal Theme Parks located in the United States in 2022, Universal Theme Parks rank among the most visited amusement parks in the world.

70.    "One of the things that allows some guests to enjoy theme parks is the measures taken to make parks accessible to those with disabilities."[20]  Such measures are crucial, as the Centers for Disease Control and Prevention ("CDC")

_____

accommodations are to be] administered." *Turner*, 167 Cal. App. 4th at 1412 (emphasis added).  And here, as explained below, Defendants' Attraction Assistance Program imposes administrative burdens and prerequisites that nondisabled persons are not required to observe in order to guarantee park access, and which ultimately prevent disabled persons from utilizing the Amusement Parks and certain services, benefits, and/or privileges available at Defendants' facilities in the same manner as nondisabled persons.  Additionally, the Attraction Assistance Program includes a pre-screening process and unlawful disclosure/medical documentation requirement that tends to screen out disabled persons by, *inter alia*, causing harm to disabled persons' dignity interest, in effect discouraging them from further visiting the Parks in the future.  Thus, modification of Defendants' Attraction Assistance Program is "necessary to guarantee physical access to the" Amusement Parks.  *Id.*

[20] Kenny the Pirate, *A Rigid New System for Theme Park Disability Access Begins* (Jul. 14, 2023), https://www.kennythepirate.com/2023/07/14/a-rigid-new-system-for-theme-park-disability-access-begins/ ("In fact, for some people, a trip to a theme park that does a stellar job with its accommodations can be a bit of a breath of fresh air.  For example, Disney Parks provide accommodation for those who are unable to wait in a conventional queue through its DAS program.").

estimates that 26% of the population – or one in four people – has a disability, which indicates that amusement parks host nearly 100 million guests with disabilities every year.[21]  Theme parks have therefore developed a wide range of accommodations for their visitors with disabilities.

71.    On or around July 24, 2023, Universal implemented its current procedures for making accommodation requests at Defendants' amusement parks in the United States, called the "Attraction Assistance Program."[22]  Under the Attraction Assistance Program, individuals who are unable to wait in line for rides and other attractions can obtain a physical Attraction Assistance Pass ("AAP") card at Universal locations in Florida and California.[23]  But first, to obtain the AAP, Defendants require guests with disabilities to register ahead of their visits to any of the Universal Theme Parks across the U.S. with the International Board of Credentialing and Continuing Education Standards ("IBCCES"),[24] a private for-profit company that describes itself as "the industry leader in cognitive disorder training and certification for healthcare, education and corporate professionals

---

[21] *See* Theme Park Insider, *A New Solution for Disability Access at Theme Parks?* (Nov. 17, 2021), https://www.themeparkinsider.com/flume/202111/8617/ ("'According to the CDC, 26% of the population has a disability. So pick those numbers, and 97 million of the 375 million guests who go to amusement parks every year have some sort of disability.  That's one in four people who have a disability.'").

[22] *See* Universal Studios Hollywood, *Accessibility Information for Your Visit*, https://www.universalstudioshollywood.com/web/en/us/accessibility-information; Universal Orlando Resort, *Accessibility Information*, https://www.universalorlando.com/web/en/us/plan-your-visit/accessibility-information.

[23] *See id*. ("Universal Studios Hollywood has developed an Attractions Assistance Pass for Guests who have a difficulty with extended waits in a conventional attraction queue environment."); *accord* Universal Orlando Resort, *Accessibility Information, supra* (same).

[24] *See id*. ("Guests requesting an attraction queue accommodation must obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org at least 48 hours prior to their visit to the park."); *accord* Universal Orlando Resort, *Accessibility Information, supra* (same).

---

around the globe."[25]  There are several steps required for park guests to obtain an AAP, and thus, accommodations under Defendants' disability access program, pursuant to which park guests must register with IBCCES and obtain an Individual Accessibility Card ("IAC") in advance of their park visit.[26]  Broadly speaking, the steps are as follows: (1) complete the online application; (2) take IAC to participating park; and (3) get access to available accommodations.[27]

72.    **Step 1:** First, eligible "[g]uests requesting an attraction queue accommodation [at Universal amusement parks] must obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org at least 48 hours prior to their visit to the park."[28]  This registration process involves filling out an online application through IBCCES, which requires submission of documentation regarding, *inter alia*, guests' medical conditions and contact information for a healthcare, education, or government professional.  Specifically, to obtain an IAC, disabled persons seeking accommodations must, among other things, specify their disability/disorder, list the type(s) of accommodation sought, and submit various documentation, including a photo of the person who will be using the pass and medical records verifying the individuals' claimed disability, such as a statement from a healthcare provider, government entity, or educational support professional

---

[25] IBCCES Certified Autism Center, *Six Flags to Become First Family of Parks to Earn Certified Autism Center Designation* (Feb. 6, 2020), https://certifiedautismcenter.com/2020/02/06/six-flags/ ("For almost 20 years, IBCCES has been the industry leader in cognitive disorder training and certification for healthcare, education and corporate professionals around the globe").

[26] *See* IBCCES, *Streamlining Accommodations With the IBCCES Accessibility Card*, *available at* https://accessibilitycard.org/ (directing applicants to "register for [the] IAC at least 48 hrs prior to [their] planned visit to a park").

[27] *See id.*

[28] *See* Universal Studios Hollywood, *Accessibility Information for Your Visit*, https://www.universalstudioshollywood.com/web/en/us/accessibility-information; *accord* Universal Orlando Resort, *Accessibility Information*, *supra*.

---

related to the accommodations requested.[29]  The same information and detailed

medical documentation is required of all applicants seeking an attraction queue

accommodation at the time of registration with IBCCES, regardless of the nature of

a guest's disability (*i.e.*, whether the applicant has an obvious mobility impairment,

an invisible disability, or any other qualifying physical or cognitive disorder).[30]  In

---

[29] *See* https://accessibilitycard.org/test/ ("Information Needed for Registration: Recent photo of the cardholder for identification purposes[;] **General information about the cardholder including cognitive disorders or disabilities** and any accommodations that would be helpful[;] Contact information for the parent/guardian or support person of the cardholder[;] **Contact information for the healthcare provider of the cardholder. This includes their doctor, therapist, or counselor**[;] **Statement from your healthcare provider regarding the extent and circumstances of your disability/disorder**[.]") (emphasis added); *see also* Universal Studios Hollywood, *Accessibility Information for Your Visit*, *supra* ("The IAC registration consists of an online application which includes uploading necessary documentation."); *accord* Universal Orlando Resort, *Accessibility Information*, *supra* (same); *see also* Universal Studios Hollywood, *FAQs: Accessibility Information*, https://www.universalstudioshollywood.com/web/en/us/faqs/accessibility-information ("The IAC requires the following information to register the person needing an attraction queue accommodation: Recent photo of the cardholder for identification purposes[;] Contact information for the cardholder or the parent/guardian/support person of the cardholder[; and] **Contact information and statement from medical provider, government entity, or educational support professional related to accommodations requested**. … [T]o be eligible for the Accessibility Card you must upload a photo or pdf of a statement from your healthcare provider regarding the extent and circumstances of your disability/disorder.") (emphasis added); *accord* Universal Orlando Resort, *FAQs: Theme Park Information*, https://www.universalorlando.com/web/en/us/faqs/park-information (same).

[30] *See* Touring Plans Blog, *Changes to Universal's Attraction Assistance Pass Process* (Jul. 14, 2023), https://touringplans.com/blog/changes-to-universals-attraction-assistance-pass-process/ ("Their Attraction Assistance Pass (AAP) now requires an ID that certifies their need for accommodations. … [Y]ou now be asked [to request an accommodation] online [through the IBCCES website, which requires you to] present documentation from a medical provider or school district to confirm that you need accommodations in an attraction queue.  You will then receive an IBCCES Accessibility Card (IAC) that will be needed to obtain the AAP.  Every guest that needs accommodations with wait times will need this card, including international guests.") (emphasis added); *see also* https://accessibilitycard.org/info/ ("Any Individual asking for accommodations due to any need or disability can register for the IBCCES Accessibility Card. Below are examples of needs or accommodations requests but not limited to that would be eligible to register: …

effect, the submission of documentation is not based on any particular or specific need for verification, and decisions about whether and what documents are necessary for verification are not made on a case-by-case basis.

73. **Step 2:** "After completing the registration process, guests will receive a temporary digital [IAC] they can download or print while IBCCES reviews the documentation."[31] Additionally, under Defendants' new policy, after "all requirements for IBCCES Individual Accessibility Card are met," but before the applicant's park visit, "a Universal [ ] Team Member will contact the cardholder to discuss their request for an attraction queue accommodation prior to their park visit."[32] At least, guests seeking accommodations are *supposed* to "receive a call from Universal's Guest Services team before [they] arrive" in order to "complete the process for being pre-approved for [the] AAP."[33] However, in practice, "[t]he calls are running very far behind (months)."[34] Thus, "[i]f [an applicant does not] receive the call 48 hours before [their park] visit, and [their] IAC has been processed,"

---

Cannot stand in line for a long period of time[;] Requires ride harness[;] **Sensory Sensitivities**[;] **Wheelchair Access**[;] **Physical or Mobility restrictions**[;] Require visual assistance or guidance[;] **Special Dietary Needs**[.]") (emphasis added).

[31] WDW News Today, *BREAKING: Universal Parks Outsourcing Disability Access Service to 3rd Party; Documentation Now Required* (Jul. 13, 2023), https://wdwnt.com/2023/07/new-accessibility-card-coming-to-universal/.

[32] Universal Studios Hollywood, *FAQs: Accessibility Information*, *supra* ("Once all requirements for IBCCES Individual Accessibility Card are met, a Universal Studios Hollywood Team Member will contact the cardholder to discuss their request for an attraction queue accommodation prior to their park visit."); *accord* Universal Orlando Resort, *Accessibility Information*, *supra* ("Once all requirements for IBCCES Individual Accessibility Card are met, a Universal Orlando Team Member will contact the cardholder to discuss their request for an attraction queue accommodation.").

[33] Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), https://touringplans.com/blog/everything-you-need-to-know-universal-studios-attraction-assistance-pass; *see also* Touring Plans Blog, *Changes to Universal's Attraction Assistance Pass Process* (Jul. 14, 2023), *supra* ("Universal will contact every registered card member.").

[34] Touring Plans Blog, *Changes to Universal's Attraction Assistance Pass Process* (Jul. 14, 2023), *supra*.

---

online third-party sources advise that guests "call Universal's ADA Assistance line (407) 224-4233, and they will complete the process for being pre-approved for [the] AAP."[35]  That is because, pursuant to Defendants' new policy, the consequences of Universal's inaction at this stage are detrimental to the applicant—namely, "[i]f [the applicant] do[es] <u>not</u> have a phone conversation with a team member, <u>the IAC alone will not be enough to guarantee [they] will be issued an AAP</u>."[36]

74.     **Step 3:** Finally, with the IAC in hand, the last step is for the guest to gain access to the requested accommodation upon arrival at the park.  To do so, guests will present the IAC to Guest Services inside each park to receive a "Attraction Access Pass" ("AAP"),[37] which is a "physical card" that states, *inter*

---

[35] Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), *supra*.

[36] *Id*.; *see also* Universal Studios Hollywood, *FAQs: Accessibility Information*, *supra* ("The IAC does not guarantee specific attraction queue accommodations at Universal Studios Hollywood."); Universal Orlando Resort, *FAQs: Theme Park Information*, *supra* ("The IAC does not guarantee specific attraction queue accommodations at Universal Orlando Resort.").

[37] *See* Universal Studios Hollywood, *FAQs: Accessibility Information*, *supra* ("Please note that you will be required to present your IAC to our Guest Services team during your visit."); Universal Orlando Resort, *FAQs: Theme Park Information*, *supra* ("Please note that you will be required to present your IAC to our Guest Services team during your visit.").

*See also* Touring Plans Blog, *Changes to Universal's Attraction Assistance Pass Process* (Jul. 14, 2023), *supra* ("[After completing the registration process through the IBCCES website, i]t can take up to 48 hours to receive an answer and, if approved, your [IAC].  The card will be digital; you can choose to print it or show it on your phone at Universal's Guest Services. … When you arrive at the park, have your tickets, [IAC] card, the guest needing an AAP, and any guest you are with that day with you.  We were asked if we had an ID card and if it was downloaded before we were allowed entry in the line for Guest Services.  They will enter your [IAC] ID number; the photo you provided to the website that is on your ID card will help them confirm it is for you. … Then they will set up your AAP."); Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), *supra* ("When you arrive at the parks, stop by Guest Services first.  A Guest Services booth is outside the entrances to the right at Universal Studios Orlando, Islands of Adventure, and Universal Studios Hollywood.  Inside the park, Universal Studios Orlando's Guest Services is just inside the entrance to the right,

*alia*, the card holder's "name, dates that [the AAP] is valid, … and a bar code that is scanned at each attraction when using the AAP.  The back side has a grid printed on it for return times."[38]  As noted *supra*, Universal offers the AAP card to individuals with disabilities that prevent them from waiting in in line for rides and other attractions.  Further, AAP cards are only issued to qualified individuals that obtain IACs and present their IACs at Guest Services.  In essence, the AAP card allows such individuals "to arrive at the ride, then get a time to return to the attraction.  Basically, it's a reservation.  While [a guest with an AAP card] wait[s] for [their designated] return time, [they] can be in a more open or comfortable space, making [their] physical wait time more manageable.  When [the guest goes] back to the ride at [their] return time, [they] can use the Express Pass Lane."[39]  Thus, while the AAP does not provide immediate access to an attraction by allowing disabled individuals to altogether skip the line, individuals with valid AAP cards spend the majority of their wait time virtually.  In the meantime, this accommodation allows guests to rest

and Islands of Adventure is close to the Marvel area on the left. … After the Guest Services team member greets you and asks what they can assist with, say that you need assistance in the parks.  They will ask for your IBCCES Accessibility Card, which will give them all the information they need. … If you do not already have the Accessibility Card, Team Members will not discuss your medical information with you so that you can get an Attraction Assistance Pass. As they prepare your Attraction Assistance Pass, AAP, … [t]he Team Member will explain how the accommodations work and how long the AAP is valid.  Typically it is valid for your length of stay or up to 14 days.").

[38] Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), *supra*.

[39] *Id*.; *see also id*. ("To get a return time, visit the attraction's entrance and look for a Team Member with a clipboard. Ask them for a return time and hand them the card. They will write the attraction's name, the time you arrived, the current wait time, and the time you may return. The last cell on the grid will remain blank until you return. … When it's your time to ride, go to the attraction's entrance and look for the Team Member with a clipboard, they will validate your pass. … After your time has been validated, you'll be directed to the Express Pass Lane.  Keep the card out because it will be scanned multiple times while you're in the queue. … Once you have experienced the attraction, you may get a return time for another attraction.  You can not have more than one active return time.").

in a comfortable location or enjoy other attractions in the area until their wait time is over.

75.    Importantly, the requirement that guests seeking accommodations must apply through IBCCES in advance of their park visits – at least 48 hours in advance[40] – means, necessarily, that they cannot any longer seek accommodations in-person at the park on the day of their visits.  Thus, if a guest—unaware of the new IBCCES procedure in place at all Universal Theme Parks—simply shows up to the park and requests accommodations upon arrival (as happened to Plaintiff F.C.), it is already too late; Universal will not accommodate guests under such circumstances, and the guest will not receive (or even be able to seek) reasonable accommodations for that visit, as advance registration is required.  There is also no flexibility for disabled individuals to submit accommodation requests via any other format beyond the uniform application form on the IBCCES website.  As above, these restrictions regarding the timing and form of an attraction queue accommodation request apply to all park guests seeking such an accommodation, even to those guests whose disabilities and accommodation needs are obvious.  Defendants will not provide any accommodation, even as a one-time courtesy, to guests who arrive to the park without an IAC.

76.    Finally, the IAC lasts for one year and can be used worldwide at all Universal amusement parks, and any other attraction or property that partners with the IBCCES.[41]  After one year, the IAC expires; thus, guests "must apply annually

---

[40] *See* Disability Scoop, *Universal Parks Now Requiring Documentation For Disability Accommodations* (Jul. 28, 2023), https://www.disabilityscoop.com/2023/07/28/universal-parks-now-requiring-documentation-for-disability-accommodations/30478/ ("The process must be completed at least 48 hours before arrival at a Universal park.").

[41] *See* Universal Studios Hollywood, *FAQs: Accessibility Information*, supra ("The IAC is valid for one year and can be used at other properties that participate in the IBCCES IAC program.").

---

for a new card."[42]  This is true, even where the disability, by its nature, or the documentation provided in connection with a guest's initial application, indicated that the impairment in question and corresponding need for accommodation would be permanent.  Moreover, while the IAC "is valid for up to one year…, the AAP is good for either the length of stay for your ticket or if you and everyone you are with is a passholder then the AAP is valid for 14 days."[43]  Therefore, even before the IAC's one-year period of validity runs, guests "will still need to visit Guest Services every two weeks for accommodations."[44]

77.    As noted above, Defendants' accommodations request system is administered by "IBCCES, the training and certification organization behind certified autism centers and other accessibility-related programs, [which] … created [the IAC] to help streamline accommodations processes at theme parks and other attractions."[45]  "However, for those unable to access the card, there is a risk of the system creating limitations (particularly for those with a developmental disability or intellectual disability who may not know about the rules)."[46]  Indeed, in actual practice, the IBCCES pre-registration requirement "has the impact of posing more red tape for already marginalized communities to access theme parks. … [The

---

[42] *Id.*

[43] Touring Plans Blog, *Changes to Universal's Attraction Assistance Pass Process* (Jul. 14, 2023), *supra*.

[44] *Id.* ("The ID that is valid for up to one year only replaces a team member asking you personal questions while they assist you.").

[45] USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/.

[46] Inside The Magic, *Theme Parks Single Out Disabled Guests to Make "Fun Faster"* (Sep. 23, 2023), https://insidethemagic.net/2023/09/theme-parks-single-out-disabled-guests-to-make-fun-faster-cm1/ ("Theme parks have begun singling out disabled guests by requiring them to provide a card from a centralized board.").

---

program has] caus[ed] concern for those struggling with card access."[47]  As "Shannon Des Roches Rosa, senior editor of Thinking Person's Guide to Autism and the mom of an autistic son, [explained,] … requiring preapproval [from people who actually need accommodations] takes away from their ability to visit parks spontaneously."[48]

78.    Moreover, the documentation requirement is problematic.[49]  To start, the requirement to submit documentation is burdensome and cannot reasonably be met by all persons with an ADA-qualifying injury, as the CDC has noted that at least 25% of adults do not have a usual health care provider.[50]  Furthermore, while the requirement is burdensome to and intrusive for all, this is particularly true "**[f]or those with invisible disabilities** – such as anxiety, PTSD, or **autism** – [because] this

---

[47] *Id.*

[48] USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/; *see also* Kenny the Pirate, *A Rigid New System for Theme Park Disability Access Begins* (Jul. 14, 2023), https://www.kennythepirate.com/2023/07/14/a-rigid-new-system-for-theme-park-disability-access-begins/ ("Guests requesting an attraction queue accommodation must obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org prior to their visit. … **[M]any guests are frustrated with [the new requirements].  Obtaining a card is an added layer of hassle to add to the process**.") (emphasis added).

[49] *See, e.g.*, Inside The Magic, *Universal Facing Backlash for "Gross" Treatment of Disabled Guests* (Jul. 14, 2023), https://insidethemagic.net/2023/07/universal-disability-system-sparks-outrage-with-universal-orlando-guests-cj1/ ("[Universal's] **new system has sparked outrage** in the online theme parks community. … [T]he 'extreme' new system requires too much from those hoping to get the support they need on their next Universal visit. … **The biggest issue is gaining a written statement about one's requirements for a disability pass**.") (emphasis added).

[50] *See* USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/ ("What if you don't have documentation?  **At least 1 in 4 adults with disabilities doesn't have a usual health care provider, according to the Centers for Disease Control and Prevention**.  [Nevertheless,] '[i]n order to receive an Accessibility Card, some documentation related to the accommodations is needed,' IBCCES said.") (emphasis added).

---

[documentation requirement] **adds a whole other obstacle to a Universal vacation as a diagnosis, never mind written documentation, can be so hard to receive**."[51] Indeed, "this kind of [perquisite] is the exact thing that puts people of determination off visiting a theme park in the first place."[52]

79.     As a result, Universal is "able to restrict accommodations (and therefore access to a desired attraction) because of documentation requirements."[53] Further, given the sensitive nature of the documentation that applicants must submit, this requirement has given rise to dignity, privacy, and data security concerns.  For instance, "[c]ritics have expressed concern about uploading personal medical information to a third-party site," especially given that "private companies don't have to follow the same federal law restricting the release of medical information as health care providers, which worries some."[54]  Thus, "[e]ven those able to provide paperwork feel uncomfortable with how invasive the process has become."[55]

### C.     Online Consumer Complaints Regarding Defendants' New Procedures For Requesting Accommodations At Universal Parks

80.     Online consumer complaints indicate that the above concerns have become a reality, as disabled individuals are indeed harmed by the rigid, burdensome, "gross," and "intrusive" Attraction Assistance Program at Universal.[56]

---

[51] Inside The Magic, *Universal Facing Backlash for "Gross" Treatment of Disabled Guests* (Jul. 14, 2023), *supra* (emphasis added).

[52] *Id*. ("Universal, it's Disability Pride Month. Do better.").

[53] Inside The Magic, *Theme Parks Single Out Disabled Guests to Make "Fun Faster"* (Sep. 23, 2023), https://insidethemagic.net/2023/09/theme-parks-single-out-disabled-guests-to-make-fun-faster-cm1/.

[54] USA Today, *Travelers with disabilities need this card for accommodations at some theme parks* (Sep. 21, 2023), https://www.usatoday.com/story/travel/experience/theme-parks/2023/09/21/disabilty-pass-theme-park-accomodations-accessability/70910695007/.

[55] Inside The Magic, *Universal Facing Backlash for "Gross" Treatment of Disabled Guests* (Jul. 14, 2023), *supra*.

[56] *Id*.

---

Indeed, "[t]he process of gaining an IAC … has been labeled both complex and intrusive."[57]  Specifically, "disabled travelers say the[ new policies] create additional burdens when they travel," and that, in particular, "the documentation requirement could present challenges." [58]  For instance, *The Wall Street Journal* reported that "Amy Schinner, a theme-park researcher for travel-planning company Touring Plans, relies on accommodations at theme parks for her 25-year-old son, Ben, who is autistic … [and] has difficulty waiting in long lines for rides."[59]  Ultimately, "[t]he [Schinner] family provided a school document from 2006 in Benjamin's

---

[57] Inside the Magic, *Universal Orlando Brings Guest to Tears After Rude Accessibility Interrogation* (Jul. 19, 2023), https://insidethemagic.net/2023/07/universal-accessibility-brings-guest-to-tears-after-ending-its-disability-service-cj1/; *see also id.* ("**Last week, theme park fans were outraged** when both Universal Studios Hollywood and Universal Orlando Resort revealed that they were ditching their current accessibility service to instead outsource the service elsewhere.  Now, their biggest **concerns are becoming a reality as those trying to use the new service face obstacles that brought one Guest to tears**. … Now, Guests needing extra accommodation at the Wizarding World of Harry Potter, SUPER NINTENDO WORLD, and other Universal attractions must first obtain an Individual Accessibility Card (IAC) from the International Board of Credentialing and Continuing Education Standards (IBCCES). … Those hoping to obtain one must first register online at least 48 hours before they visit the Park, as well as provide photo identification and a statement from a doctor or healthcare provider or an Individualized Education Plan (IEP) as written confirmation that an IAC is required. … **[I]t seems like Guests' biggest fear of IBCCES auditing their need for an access card is very much valid**.  A Universal Parkgoer recently took to Reddit to share their experience, which ultimately brought her to tears. … 'I was so frustrated that I broke out in tears,' they wrote.  'I am truly trying to get this pass because I felt it was needed for my son to be able to fully enjoy and experience the parks, and as a child who deals with his disability day in and day out, it's nice to be able to forget about it for a while at the parks, but it seems like Universal is now intent on treating everyone as if they're trying to cheat the system.'  The Guest also negatively compared Universal to Disney, arguing that their treatment 'paled in comparison to how they dealt with it at Disney, and [she's] so incredibly disappointed in them that it's making [her] question [their] decision to visit.' … This is the exact kind of encounter Guests were worried about when it came to accessibility at Universal, and it seems like their fears were pretty valid.") (emphasis added).

[58] The Wall Street Journal, *Some Travelers Abused Disability Accommodations. Now Comes the Crackdown.* (Aug. 23, 2023), https://www.wsj.com/lifestyle/travel/travel-disabilities-flights-theme-parks-8134afa3.

[59] *Id.*

---

application[.]"[60]  But ""[t]o get his records took a lot,' says Schinner, who lives in Winter Garden, Fla."[61]  For many others, the documentation requirement has made obtaining an IAC (and, thus, accommodations) nearly impossible, not merely burdensome.  "As user @ajimich_elle wrote, 'I literally can't go to Universal anymore [because] I don't have insurance to get a drs note for a disability I was diagnosed with 10 years ago[.]'"[62]

81.     Privacy concerns are also front-of-mind for individuals in need of accommodations at Universal following July 2023.  For example, in an online post (shown in the screenshot below), @obb1213 wrote: "My son has autism.  I have documented paperwork from the dr that shows diagnosis etc.  It's so intrusive.  Can't believe they're doing this."[63]  Likewise, as shown below, @JourneywJosh complained: "To be honest with you, I think this is disgusting.  I think it is wrong that people with a disability have to give us so much information to a third-party candidate from Universal.  Not only that but with their disability, they could still likely get denied a disability pass for their visit."[64]

<hr>

[60] *Id*.

[61] *Id*.

[62] Inside The Magic, *Universal Facing Backlash for "Gross" Treatment of Disabled Guests* (Jul. 14, 2023), *supra*.

[63] https://twitter.com/obb1213/status/1679636637012328448.

[64] https://twitter.com/journeywjosh/status/1679590958151737345.

       *See also* IBCCES Certified Autism Center, *An Answer for Ride and Attractions Accessibility Programs* (Oct. 1, 2019), https://certifiedautismcenter.com/2019/10/01/accessibility-programs/ ("The IAC registration system collects and stores documentation needed to access certain special needs accommodations or benefits at amusement parks and attractions.").





82.    Likewise, numerous individuals posted comments echoing these concerns in a WDWMAGIC.COM Forum discussion regarding Universal's new disability access policy, which was initiated on August 2, 2023:[65]

---

[65] *See* WDW Magic, Forum Post: "Universal Studios new disability pass," https://forums.wdwmagic.com/threads/universal-studios-new-disability-pass.981634/.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Autumn**
New Member
Original Poster

Aug 3, 2023                                         #19

I am becoming very stressed out by this whole new process that is making it hard for me to prove that a member of my family cannot wait on a long line because of a disability. What is supposed to be a fun vacation is becoming a nightmare. I still have not figured out what kind of doctor's letter Universal wants, how to download this letter and what to do if there is no email address that is specific for this doctor. I should just wait on a long line with my family member and when he passes out in the heat because he cannot wait on line and my documents were not good enough will Universal stop this? We are not faking a disability. There are other disabilities that are not apparent. We are all adults and know which attractions are appropriate and which are not. This third party seems to only work if you have a cognitive disability not a health issue.

**mkt**

Aug 5, 2023                                         #27

At least to me there's a certain degree of discomfort of having to provide medical documents to someone who isn't a medical professional.

**lazyboy97o**

Aug 6, 2023                                         #43

My95cobras said: ⊕
There is a solution to this.... If you don't like it, don't go.

No it is not. It is the exact opposite of accessibility.

**lazyboy97o**
Well-Known Member

Aug 7, 2023                                         #59

Tom Morrow said: ⊕
Not sure if this has already been brought up in here, but this system has already been in place at every Six Flags for a little while as well as a few other parks:

Current IAC Participating Locations - Accessibility Card
⊕ accessibilitycard.org

Click to expand...

The original purpose of the pass was to remove barriers by creating a common system that would be used by multiple destinations. You were supposed to be able to take the pass to participating locations and receive the accommodations without the hassle of having explain your needs over and over again. It was supposed to remove having to deal with the variety of different policies and the wild variety of staff who may or may not properly understand the law and the needs of guests.

That's not how it is working in practice. Instead of removing barriers it is adding barriers. The pass is instead being used as just an initial screening process. What was previously a one step process is now a multi-day, multi-step process. The whole process could easily take a week from requesting documentation from your medical provider to finally speaking with Universal. The whole purpose of accessibility is that it should just be there as much as possible.



83.     Yet more unhappy park-goers have complained about Universal's new disability access policy on Reddit:[66]



84.     In the same vein, Reddit user @DarkLordFRCMentor commented, in relevant part, the following in a July 17, 2023 post:

[66] *See*  https://www.reddit.com/r/UniversalOrlando/comments/152i5ns/ worst_experience_ever_with_new_attractions/.

[This is] nothing short of unacceptable. …

If a mom of a little kid with a doctor's note and comprehensible (to non-disabled, non-community people) disabilities gets treated like this, it's likely that the rest of us aren't even getting through the metaphorical door.

You're right, **it is an unnecessary violation of our privacy to be expected to give that level of detail to get accommodations**. …

It's a shame that disabled people aren't a very financially-flush group. I highly doubt that this setup would pass ADA muster (if you really read it in detail, requiring medical proof rather than just self-description of need is verboten outside of certain education/testing settings), but sadly, we were given protections that are only enforced with lawsuits (or the threat thereof). So if it sounds reasonable enough to the abled people, **we get ignored or even denigrated** when we explain why it's not.

**This is exactly the sort of response that I used to fear, and spent way too much of my life getting by without accommodations in order to avoid**. … **I'm seriously reconsidering my upcoming Universal trip**, which is sad because I literally just had a doctor's appointment (unrelated, just well timed, otherwise this would also be a hurdle I couldn't reasonably get over) and asked them to sign off on my issues, but I know I can't handle the kind of interrogation you described here (especially over the phone, one of my disabilities is audio processing disorder). ….[67]

85.    The above complaints are just a sampling of numerous negative comments and concerns consumers have expressed regarding Defendants' new unlawful disability access policy for requesting accommodations at the Universal Amusement Parks.

### D.    The Necessity And Feasibility Of Implementing Plaintiffs' Proposed Modifications To Defendants' Discriminatory Policies, Practices, And Procedures Regarding Disability Access

86.    As explained further below, modification to Defendants' current disability access policies, practices, and/or procedures is necessary to afford the goods, services, facilities, privileges, advantages, or accommodations of Defendants' Amusement Parks to individuals with disabilities, like Plaintiffs.  Further, Plaintiffs'

---

[67] https://www.reddit.com/r/UniversalOrlando/comments/152i5ns/comment/jse4u27/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button (emphasis added).

proposed modifications (listed below) would not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations, is readily achievable, and would not result in an undue burden to Defendants.  In fact, in adopting the unlawful Attraction Assistance Program, Defendants eschewed less discriminatory alternative methods for requesting reasonable accommodations that could have been implemented without much difficulty or expense.  This is exemplified by the fact that the Attraction Assistance Program at Universal described above is far more burdensome, restrictive, and, ultimately, discriminatory than other disability access programs in place at several major amusement parks today and in recent years (such as that of Disney, discussed in detail below).

87.     To start, prior to July 2023, there was an entirely different process in place for individuals with disabilities to seek accommodation at Universal, and that program lacked many of the discriminatory features of Defendants' current Attraction Assistance Program.  Indeed, Defendants' prior disability access program – which was overhauled in July 2023 when Universal adopted the current system, including the IAC requirement, in partnership with IBCCES – did not raise the same concerns as those relating to the new Attraction Assistance Program, discussed *supra*.  For instance, the pre-2023 system did not require guests to request accommodations in advance of their park visits through any "pre-arrival screening process"[68] or that applicants submit any accommodation request "at least 48 [hours] prior to" their planned park visit.[69]  Instead, spontaneous park-goers – like Plaintiff F.C., a season ticket holder during the 2023-2024 season at Universal – were able to request accommodations in-person, at the park, on the same day as their visit.  All guests had to do to obtain an Attraction Assistance Pass prior to 2023 was show up to the park, navigate to the "guest services" kiosk, and explain the nature of

---

[68] IBCCES, *IAC Program*, https://ibcces.org/iac-program.

[69] IBCCES, *Streamlining Accommodations With the IBCCES Accessibility Card*, available at https://accessibilitycard.org/.

accommodation needed to an employee.[70]  Now, guests must *still* observe this step upon arrival to the park[71], but *first* guests must: (1) complete registration on the IBCCES website at least 48 hours in advance of their park visit and obtain the IAC;[72] and (2) have a follow-up call with Universal's Guest Services team before

---

[70] *See* World of Walt, *Universal Will Require Documentation For Skip-The-Line Disability Access. Is Disney Next?* (Jul. 13, 2023), https://worldofwalt.com/universal-will-require-documentation-for-skip-the-line-disability-access-is-disney-next.html ("Beginning July 24, Universal Orlando Resort and Universal Studios Hollywood will be launching a new accessibility service and eliminating the current system, providing guests with a new way to request accommodations at certain attractions.  **Currently, guests who are not able to stand in line for long periods of time are required to go to guest services on each day of their Universal trip**. They then receive a card they can take to attraction entrances, where they get a return time comparable to the attraction's current wait time.") (emphasis added).

[71] As noted above, under Defendants' current Attraction Assistance Program, after completing registration on the IBCCES website and obtaining the IAC, guests must still go to Guest Services on the day of their visit in order to (again) explain their need for accommodation to Universal staff.  *See* Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), https://touringplans.com/blog/everything-you-need-to-know-universal-studios-attraction-assistance-pass ("When you arrive at the parks, stop by Guest Services first.  A Guest Services booth is outside the entrances to the right at Universal Studios Orlando, Islands of Adventure, and Universal Studios Hollywood.  Inside the park, Universal Studios Orlando's Guest Services is just inside the entrance to the right, and Islands of Adventure is close to the Marvel area on the left. … After the Guest Services team member greets you and asks what they can assist with, say that you need assistance in the parks.  They will ask for your IBCCES Accessibility Card….."); *see also* Touring Plans Blog, *Changes to Universal's Attraction Assistance Pass Process* (Jul. 14, 2023), https://touringplans.com/blog/changes-to-universals-attraction-assistance-pass-process/ ("When you arrive at the park, have your tickets, card, the guest needing an AAP, and any guest you are with that day with you.  **We were asked if we had an ID card and if it was downloaded before we were allowed entry in the line for Guest Services.**  They will enter your ID number; the photo you provided to the website that is on your ID card will help them confirm it is for you. … Then they will set up your AAP. … The Accessibility Identification Card is valid for up to one year.  However, the AAP is good for either the length of stay for your ticket or if you and everyone you are with is a passholder then the AAP is valid for 14 days. … **You will still need to visit Guest Services every two weeks for accommodations**.") (emphasis added).

[72] *See* Undercover Tourist, *Overview of the Universal Studios Hollywood Attraction Assistance Pass (AAP)* (Feb. 5, 2024), https://www.undercovertourist.com/blog/universal-studios-hollywood-guest-

---

arriving to the park in order to "complete the process for being pre-approved for [the] AAP."[73] **Further, the "major difference from the previous" disability access procedures in place at Universal prior to July 2023 is that "guests did not need to provide documentation" to obtain the accessibility card or the associated accommodations**.[74] So, what was just one step under the prior system for requesting accommodations at Universal is now "several steps" under the new

---

assistance-pass-gap/ ("If you have used the Universal Studios Hollywood Attraction Assistance Pass (AAP), we have big news to announce. As of July 24, 2023, Universal has changed its accommodations request process for guests with disabilities[.] … With the new process, guests whose disabilities prevent them from waiting in a standard queue must obtain an International Board of Credentialing and Continuing Education Standards (IBCCES) Individual Accessibility Card (IAC) at least 48 hours prior to visiting the park.  **Obviously, this is a big change from setting it up in the park, and that means you'll need to do some advance planning before you arrive**.") (emphasis added).

[73] Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), *supra* ("Be advised you may receive a call from Universal's Guest Services team before you arrive.  If you don't receive the call 48 hours before your visit, and your IAC has been processed, you should call Universal's ADA Assistance line (407) 224-4233, and they will complete the process for being pre-approved for your AAP.  **If you do not have a phone conversation with a team member, the IAC alone will not be enough to guarantee you will be issued an AAP**.") (emphasis added); *see also* Touring Plans Blog, *Changes to Universal's Attraction Assistance Pass Process* (Jul. 14, 2023), *supra* ("Universal will contact every registered card member.  **The calls are running very far behind (months)**.  If you don't hear from them before your visit, please call their ADA assistance line at (407) 224-4233.  **If you have not spoken with them, the ID may not be enough to ensure you will receive an AAP**.") (emphasis added).

[74] World of Walt, *Universal Will Require Documentation For Skip-The-Line Disability Access. Is Disney Next?* (Jul. 13, 2023), *supra* (emphasis added); *accord* WDW News Today, *BREAKING: Universal Parks Outsourcing Disability Access Service to 3rd Party; Documentation Now Required* (Jul. 13, 2023), https://wdwnt.com/2023/07/new-accessibility-card-coming-to-universal/ ("Beginning on July 24, Universal will be utilizing the IBCCES Accessibility Card, a.k.a. IAC. … Guests will need to supply … a healthcare provider or an Individualized Education Plan (IEP or equivalent), documentation from a government entity, or something similar.  This is a major difference from the previous accessibility card, for which guests did not need to provide documentation.").

---

Attractions Assistance Program, with the latter being significantly more burdensome.[75]

88.     Moreover, separate and apart from the fact that the documentation request is burdensome, intrusive, and explicitly unlawful under the ADA's implementing regulations, *see* 28 C.F.R. § 36.302(c)(6), the extra pre-arrival screening step also violates the ADA's general and specific prohibition against discrimination under 42 U.S.C. §§ 12182(a) (general rule), 12182(b)(1)(A)(i) (denial of participation), 12182(b)(1)(A)(ii) (participation in unequal benefit), 12182(b)(1)(A)(iii) (separate benefit), 12182(b)(1)(D) (administrative methods), 12182(b)(2)(A)(i) (eligibility criteria), and 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices, or procedures), **because it brings the experience of disabled park-goers at Universal further afield from that of non-disabled park-goers, who may make full use and enjoyment of Defendants' amusement parks during a spontaneous visit, without any prior planning**.

89.     Further, while Universal's pre-July 2023 in-person process was interactive and allowed employees to consider guests' accommodations requests on

---

[75] Mice Chat, *Universal To Require Prior Disability Access Approval, Should Disney Follow?* (Jul. 19, 2023), https://www.micechat.com/361015-universal-to-require-prior-disability-access-approval-should-disney-follow/ ("Beginning July 24, 2023, Guests of Universal Studios Hollywood and Universal Orlando Resort will be required to obtain an Attractions Assistance Pass.  Those interested in attraction accommodations will need to get an IBCCES Individual Accessibility Card before their visit, via online registration.  **There are several steps to the process**, listed on this website[.]") (emphasis added); *see also* Inside The Magic, *Universal Facing Backlash for "Gross" Treatment of Disabled Guests* (Jul. 14, 2023), *supra* ("Universal has now announced that from July 24, 2023, Guests needing extra accommodation at the Wizarding World of Harry Potter, SUPER NINTENDO WORLD, and other Universal attractions must first obtain an Individual Accessibility Card (IAC) from the International Board of Credentialing and Continuing Education Standards (IBCCES).  This requires Guests to register online at least 48 hours before they visit the Park. … **But it's not as simple as just filling in an online form**.  Guests requesting a card for themselves must be over 18, and they must provide photo identification and a statement from a doctor or healthcare provider or an Individualized Education Plan (IEP) as written confirmation that these services are required.") (emphasis added).

---

1
a case-by-case basis (as the ADA requires[76]), this is not true of the timing and

2
blanket documentation requirements of the Attractions Access Program.

3
Defendants' policy extends no exception to these requirements, even for those with

4
obvious disabilities.[77]  Defendants' Attraction Assistance Program is an

5
impermissible "blanket" or "one size fits all" policy for all disabled persons.  *A.L. v.*

6
*Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1290 (11th Cir. 2018).  By

7
contrast, with the pre-2023 system, guests were not required to share such medical

8
information and documentation with third parties – impinging upon guests' privacy

9
and risking their data security – as they must do under the new Attractions Access

10
Program.[78]

11
[76] *See, e.g.*, *Smith v. Walgreens Boots All., Inc.*, Case No. 20-cv-05451-CRB, 19

12
(N.D. Cal. Feb. 3, 2021) ("[W]hether an accommodation is 'reasonable' is a '**fact-specific, case-by-case inquiry that considers**, among other factors, the

13
effectiveness of the modification in light of **the nature of the disability in question** and the cost of the organization that would implement it.'") (emphasis added)

14
(quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004));

15
*see also, e.g.*, *Accommodations and in Commercial Facilities* ("Final Rule"), 75 Fed. Reg. 56236, 56236 (Sep. 15, 2010) (codified at 28 C.F.R. part 36) ("When a person

16
has [an ADA-qualifying] disability, … determination [as to whether to provide an accommodation or modify a policy] is an individual assessment and must be made

17
on a case-by-case basis."); *id.* at 56294 ("[A] blanket formula inherently is less fair, less flexible, and less effective than … [a] case-by-case determination for whether an

18
action is readily achievable.").

19
[77] *See* IBCCES, *Streamlining Accommodations With the IBCCES Accessibility Card*,

20
https://accessibilitycard.org/ ("The International Board of Credentialing and Continuing Education Standards (IBCCES) created the digital IBCCES Accessibility

21
Card (IAC) … for individuals who need to request accommodations or assistance at participating amusement parks and attractions.  The IAC is for <u>anyone</u> who is

22
requesting accommodations – **including but not limited to individuals who are autistic, use a wheelchair, are blind/low vision, deaf/hard of hearing, have**

23
**mobility support needs, are accompanied by a service animal, have sensory sensitivities, cognitive disabilities, or have other needs and concerns**.")

24
(underlining in original; bolding added for emphasis).

25
[78] *See* World of Walt, *Universal Will Require Documentation For Skip-The-Line*

26
*Disability Access. Is Disney Next?* (Jul. 13, 2023), *supra* ("Individuals requesting the IAC card for themselves must … [submit] a statement from a healthcare provider, an

27
Individualized Education Plan (IEP or equivalent), documentation from a government entity, or something similar … in order to receive the IAC card.  This is

28

90.     Moreover, comparison to the disability access policies and practices of Defendants' main competitor – Disney[79] – highlight the pitfalls of the Attractions Access Program at Universal.  Disney's current Disability Access Service ("DAS") program allows cognitively disabled guests like the plaintiffs (1) to enter immediately all rides with waits of less than 15 minutes, which is most rides; (2) to schedule appointment times for rides with longer waits; and (3) to never have to stand in a physical line for any ride.  The critical difference between Disney's DAS program and the Attraction Assistance Program in place at the Universal Theme Parks is that "**Disney has chosen to accept each guest's verbal representations as to his disability without requiring any proof and issues him a DAS Card, no matter how slight or severe the … disability**."  *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1291 (11th Cir. 2018) (emphasis added).  In fact, based in part on this feature, the Eleventh Circuit rejected a challenge to Disney's DAS program pursuant to the ADA, holding that, "[u]nder the factual circumstances of this case, we conclude that Disney's [] issuance of DAS Cards, in and of itself, does not violate the ADA."  *Id.*; *see also A.L. by & through D.L. v. Walt Disney Parks & Resorts US, Inc.*, 469 F. Supp. 3d 1280, 1308 (M.D. Fla. 2020), *aff'd*, 50 F.4th 1097 (11th Cir. 2022) (**quoting 28 C.F.R. § 36.302(c)(6) and noting that per this regulation, "Disney was unable to ask about the nature or extent of an individual's disability" in connection with its disability access system**) (emphasis added); *accord Davis v. SeaWorld Parks & Ent., Inc.*, 2023 WL 4763451, at *10 (M.D. Fla. July 25, 2023) ("Under the applicable regulations, a public-accommodation['s] … questioning of the 'nature' or 'extent' of a disabled person's

a major difference from the previous accessibility card, for which guests did not need to provide documentation.").

[79] Disney owns and operates four theme parks in the United States, including Disneyland Park in Anaheim, California, and Magic Kingdom Theme Park, Disney's Animal Kingdom, and Disney's Hollywood Studios at Walt Disney World Resort in Lake Buena Vista, Florida.

disability violates the ADA[.]"); *Garneaux v Kym Ventures LLC*, 2018 WL 8131765 (N.D. Ga. Sept. 6, 2018) ("[T]he ADA regulation [§ 36.302(c)(6)] provides that a 'public accommodation shall not ask about the nature or extent of a person's disability'").

91.     Further, in administering its DAS program, Disney, unlike Universal, undertakes an individualized inquiry to determine the specifics of each guest's disability and to implement modifications tailored to each plaintiff's needs." *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1291-92 (11th Cir. 2018) ("It is also noteworthy that Disney's Guest Relations staff interact with parents of individual disabled guests when they arrive to obtain a DAS Card and other services. Guest Relations staff discuss additional accommodations, such as Re-ad Passes, with parents who wish to discuss their autistic child's unique needs and are concerned the DAS Card will not meet those needs.  While not every plaintiff received Re-ad Passes, that issue goes to whether the ADA requires more accommodations than Disney currently provides and does not diminish the fact that Guest Relations staff will discuss an individual's needs and consider whether to provide additional accommodations.").  No such interactive process occurs under Defendants' Attraction Assistance Program, upon arrival at the Park or otherwise.  Defendants' inflexible system does not permit guests to make in-person accommodation requests under any circumstances.[80]

---

[80] *See* Universal Studios Hollywood, *Accessibility Information for Your Visit*, https://www.universalstudioshollywood.com/web/en/us/accessibility-information ("Guests requesting an attraction queue accommodation **must** obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org at least 48 hours prior to their visit to the park.") (emphasis added); *accord* Universal Orlando Resort, *Accessibility Information*, https://www.universalorlando.com/web/en/us/plan-your-visit/accessibility-information ("Guests requesting an attraction queue accommodation **must** obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org ….") (emphasis added); *see also* Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), *supra* ("If you do not already have the Accessibility Card,

92.     Accordingly, there is no question that Defendants could devise a new program, or modify its current disability access system, so as to ensure equal access to Defendants' facilities in compliance with state and federal laws prohibiting discrimination on the basis of disability.  Defendants' current Attractions Access Program, however, is not close.  As explained in detail below, the pre-screening process for obtaining an IAC violates the ADA, Unruh Act, and CDPA because, *inter alia*, it is inflexible, gives the same blanket treatment to all disabilities and accommodation requests rather than considering them on a case-by-case basis, and imposes undue burdens on disabled individuals not shared by nondisabled persons. That, in turn, constrains the manner in Defendants' facilities may be used and enjoyed by disabled persons and risks harm to their dignity interests.  Defendants have therefore failed to implement policies, procedures, and practices respecting the civil rights and needs of disabled individuals.

**E.     Plaintiffs And Members Of The Putative Classes Have Been Denied Full And Equal Access To Defendants' Facilities**

**D.P.**

93.     Plaintiff D.P. ("D.P.") is a natural person and a citizen of California, residing in Long Beach, California.

94.     D.P. suffers from ADA-qualifying disabilities—namely, severe arthritis in her knees and irritable bowel syndrome.  *See* 42 U.S.C. § 12102(1)(A) ("The term 'disability' means, with respect to an individual … (A) a physical or mental impairment that substantially limits one or more major life activities of such individual[.]"); *accord* 28 C.F.R. § 36.105(a)(1)(i).

---

Team Members will **not** discuss your medical information with you so that you can get an Attraction Assistance Pass.") (emphasis added).

95.     Arthritis is a "musculoskeletal (MSK) disorder" that "causes joint pain, swelling, and stiffness" and "prevents typical movement."[81]  In addition, common symptoms include, *inter alia*, "stiffness, recurring pain or tenderness in any joint, obvious redness and warmth in a joint, … or weakness combined with joint pain that last more than two weeks."[82]  Thus, "[a]rthritis affects a person's overall function

---

[81] Medical News Today, *Is arthritis a musculoskeletal disorder?* (Sep. 24, 2023), https://www.medicalnewstoday.com/articles/is-arthritis-a-musculoskeletal-disorder ("All forms of arthritis are musculoskeletal (MSK) disorders[.] … The MSK system is made up of bones, muscles, ligaments, and tendons. … The term 'arthritis' refers to several conditions that affect the muscles, joints, and bones. All forms of arthritis are MSK conditions. Arthritis causes joint pain, swelling, and stiffness. It also prevents typical movement.").

*See also* StatPearls, *Arthritis* (Jun. 20, 2023), https://www.statpearls.com/articlelibrary/viewarticle/17853 ("Arthritis is defined as an acute or chronic joint inflammation in the joint. Arthritis may attribute to a wide variety of symptoms that include pain, stiffness, decreased range of motion, and joint deformities."); Mayo Clinic, *Arthritis*, https://www.mayoclinic.org/diseases-conditions/arthritis/symptoms-causes/syc-20350772 ("Arthritis is the swelling and tenderness of one or more joints. The main symptoms of arthritis are joint pain and stiffness, which typically worsen with age. … The most common signs and symptoms of arthritis involve the joints. … [S]igns and symptoms may include: Pain[;] Stiffness[;] Swelling[;] Redness[; and] Decreased range of motion[.]"); Johns Hopkins Medicine, *Arthritis*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/arthritis ("Arthritis and other rheumatic diseases are common conditions that cause pain, swelling, and limited movement. They affect joints and connective tissues around the body. … Arthritis means redness and swelling (inflammation) of a joint. A joint is where 2 or more bones meet. … Arthritis is usually ongoing (chronic). … The most common symptoms include: Pain in 1 or more joints that doesn't go away, or comes back[;] Warmth and redness in 1 or more joints[;] Swelling in 1 or more joints[;] Stiffness in 1 or more joints[; and] Trouble moving 1 or more joints in a normal way[.]").

[82] Job Accommodation Network ("JAN"), *Accommodation and Compliance Series: Employees with Arthritis* (Mar. 22, 2010), https://www.govinfo.gov/content/pkg/GOVPUB-L41-PURL-gpo9237/pdf/GOVPUB-L41-PURL-gpo9237.pdf; *see also* Johns Hopkins Medicine, *Arthritis*, *supra* ("[Arthritis] can cause pain and movement problems. You may be less able to carry out normal daily activities and tasks. … There is no cure for arthritis. But it's important to help keep joints working by reducing pain and inflammation. … Extra weight puts more stress on weight-bearing joints, such as the hips and knees. … **Using assistive devices.** Canes, crutches, and walkers can help keep stress off certain joints and improve balance. **Using adaptive equipment.** Reachers and grabbers let you extend your reach and

---

and mobility, which can result in activity and other limitations."[83]  For instance, individuals, like D.P., that have arthritis affecting their "knees may have difficulty standing … [or] sitting for long period[s]" of time.[84]  Other "common daily activities that many people with arthritis report are 'very difficult' or that they 'cannot do[]'" include, *inter alia*, "[g]rasp[ing] small objects[; r]each[ing] above one's head[;] … [l]ift[ing] or carry[ing] as much as 10 pounds[; c]limb[ing] a flight of stairs without resting[; p]ush[ing] or pull[ing] a heavy object[; w]alk[ing] a 1/4 mile[; and] … [s]toop[ing], bend[ing], or kneel[ing]."[85]

96.    Further, "IBS is a chronic, often debilitating, functional gastrointestinal (GI) disorder with symptoms that include abdominal pain, bloating, and altered bowel [behaviors], such as constipation and/or diarrhea, or alternating between the two."[86]  "In IBS, the function, or movement, of the bowel is not quite right."[87]  "A

---

reduce straining. Dressing aids help you get dressed more easily.") (bolding in original; underlining added for emphasis).

[83] Centers for Disease Control and Prevention ("CDC"), *Arthritis Disabilities and Limitations*, https://www.cdc.gov/arthritis/data_statistics/disabilities-limitations.htm.

[84] Cornell University, *Workplace Accommodations for Individuals with Arthritis* (Jan. 2001), https://ecommons.cornell.edu/server/api/core/bitstreams/8845e23b-df29-4a99-8f72-0ad4e09a3dcf/content; *see also id.* ("Many people with arthritis would meet the definition of an 'individual with a disability' under the Americans with Disabilities Act (ADA). … [A]n individual with arthritis may have **periods of severe pain and functional limitation**. In this situation, the ADA would apply[.]") (emphasis added).

[85] CDC, *Arthritis Disabilities and Limitations*, *supra*.

See also JAN, *Accommodation and Compliance Series: Employees with Arthritis* (Mar. 22, 2010), *supra* ("People with arthritis may develop … [various] limitations[, including, but not limited to,] … Fatigue/Weakness[,] … Fine Motor Impairment[,] … Gross Motor Impairment[,] … Photosensitivity[,] … Skin Irritations[,] … Sleep Disorder[,] … Stress[,] … [and] Temperature Sensitivity[.]"); *id.* (recommending various accommodations for individuals suffering from common symptoms of arthritis, including, inter alia, that they "[r]educe or eliminate physical exertion" and use "a scooter or other mobility aid if walking cannot be reduced").

[86] *See* GI Society, *Irritable Bowel Syndrome (IBS)*, https://badgut.org/information-centre/a-z-digestive-topics/ibs/ ("IBS is not limited to the large intestine (colon).").

[87] *Id.*

---

person who has IBS likely has a sensitive digestive system with heightened reactivity, so that the GI tract responds quite differently to normal gut stimuli, such as the passage of solids, gas, and fluid through the intestines.  These unusual movements may result in difficulty passing stool, or **sudden, urgent elimination**."[88] Indeed, many people who suffer from IBS, <u>including D.P.</u>, chronically experience the latter and "report suffering from untimely passage of stool."[89]  Further, "[p]ain manifests in many ways with IBS.  It can be ongoing or episodic, present sharply and resolve rapidly, occur occasionally or frequently, and move from one location in the bowel to another very quickly."[90]  "In addition, prolonged contractions of the bowel might prevent the normal passage of air and trigger bloating, belching, and flatulence.  Bloating could become so severe that clothing feels tighter and abdominal swelling becomes visible to others."[91]  In sum, given the "range of known symptoms, this condition can significantly decrease a person's quality of life."[92]

97.    Thus, as a result of D.P.'s arthritis, she experiences chronic swelling and physical pain in her legs, has limited mobility, is unable to remain standing for a significant amount of time, and has difficulty walking extensive distances, among other limitations.  Further, as a result of her IBS, D.P. must be able to urgently access restrooms at a moment's notice and without delay.

98.    D.P.'s physical impairments therefore "substantially limit" several "major life activities," including, *inter alia*, D.P.'s ability to perform manual tasks, walk, stand, lift, and bend.  42 U.S.C. § 12102(2)(A) ("[M]ajor life activities

---

[88] *Id*. (emphasis added).

[89] *Id*. ("Individuals with IBS may also experience straining to pass stool along with a feeling of incomplete evacuation (tenesmus) and immense relief of pain/discomfort when gas or stool finally passes. … These bowel experiences and their unpredictability can lead to a high degree of anxiety for those with IBS.").

[90] *Id*. ("Intestinal pain can occur when material in one section of the gut passes through slowly while material in another section passes quickly.").

[91] *Id*.

[92] *Id*.

include, but are not limited to, … performing manual tasks, … walking, standing, lifting, [and] bending ….").  Additionally, D.P.'s impairments impede the "operation of [her] major bodily function[s]," 42 U.S.C. § 12102(2)(B), including but not limited to D.P.'s "functions of the … digestive[ and] bowel," *id*., as well as her musculoskeletal functions.  *See* 29 C.F.R. § 1630.2(h)(1) ("Physical or mental impairment means—(1) Any physiological disorder or condition … affecting one or more body systems, such as … musculoskeletal … [and] digestive …."); 29 C.F.R. § 1630.2(i)(1)(ii) ("Major life activities include, but are not limited to: … (ii) The operation of a major bodily function, including functions of the … digestive, … bowel … [and] musculoskeletal … functions.").  D.P.'s impairments thus constitute disabilities under the ADA, Unruh Act, and CDPA.  *See* 42 U.S.C. § 12102(1)-(2); 28 C.F.R. § 36.105(c)-(d); 29 C.F.R. § 1630.2(g)-(j); *see also* Unruh Act, Cal. Civ. Code § 51(e)(1) ("'Disability' means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code."); CDPA, Cal. Civ. Code § 54(b)(1) ("'Disability' means any mental or physical disability as defined in Section 12926 of the Government Code."); Cal. Gov't Code §§ 12926, 12926.1.[93]

---

[93] *See, e.g.*, Arthritis Foundation, *Know Your Workplace Rights if You Have a Disability*, https://www.arthritis.org/health-wellness/healthy-living/daily-living/work-life-balance/workplace-rights-disability ("To be officially considered under the Americans with Disabilities Act (ADA), your doctor must first diagnose you as having a disability. If you have limited mobility, significant pain or moderate to severe arthritis, you probably qualify. … If you have arthritis, it is not uncommon to experience periods of pain and fatigue that make it difficult to perform day-to-day activities.") (emphasis added); *see also* CDC, *Arthritis Disabilities and Limitations*, *supra* ("For many years, arthritis and back conditions have been by far the most common main causes of disability in the U.S."); JAN, *Accommodation and Compliance Series: Employees with Arthritis* (Mar. 22, 2010), *supra* ("Arthritis … is one of the most prevalent chronic health problems, and is the nation's leading cause of disability among Americans over age 15 (National Arthritis Foundation, 2008a).").

    *See also* EEOC Informal Discussion Letter re: "ADA: Definition of Disability" (Sep. 28, 2000), https://www.eeoc.gov/foia/eeoc-informal-discussion-letter-5 ("**Irritable bowel syndrome is an impairment as defined by the ADA**. … The activity most obviously affected by irritable bowel syndrome is waste

99.    As a result, in order to make full use and enjoyment of Defendants' facilities, D.P. requires various accommodations commonly extended to similarly situated individuals at amusement parks, including, *inter alia*, standing/queuing accommodations.

100.    D.P. visited Universal Studios Hollywood in California on or around October 8, 2023.  Approximately two weeks before that planned park visit, on or around September 28, 2023, D.P. applied for accommodations at Universal by submitting an application through the IBCCES website, which included (per IBCCES rules) a mandatory disclosure of sensitive personal information and submission of medical documentation, in accordance with IBCCES's requirements. Per Defendants' and IBCCES's rules, D.P. disclosed in her IBCCES applications sensitive personal information and submitted medical documentation substantiating her claimed impairment and need for accommodation.  Specifically, D.P. submitted a screenshot from her account on the Kaiser Permanente website showing, *inter alia*, her medical identification number, date of birth, and a list of medical diagnoses, including her arthritis and IBS diagnoses.

101.    All told, D.P. found the process of registering and applying for accommodation through the IBCCES website embarrassing, degrading, and confusing.  Specifically, D.P. felt embarrassed about having to provide such private information and documentation in order to make a basic request for accommodation, and degraded and upset by Defendants' baseline assumption that her reported need and underlying mobility impairment would be fabricated and their refusal to believe that she was being truthful as to her need for accommodation absent documentary proof.  She was also deeply offended by Defendants' demand for proof of disability and IBCCES's scrutiny of such proof in order to assess the veracity of D.P.'s

---

elimination. … [I]t is certainly possible that waste elimination could be considered a major life activity. Irritable bowel syndrome also may affect other major life activities for certain individuals, such as caring for oneself.") (emphasis added).

reported need for accommodation, given that neither Universal nor IBCCES is a medical professional empowered to make such a determination, and in light of D.P.'s use of a wheelchair and, therefore, the obvious nature of her mobility impairment.  She also found the process of registering and applying for accommodations through the IBCCES website very confusing due to the online application's rigidity, a general lack of guidance regarding the process, and the inability to ask questions relating to D.P.'s specific circumstances or engage in any interactive process.  For instance, the online application asks numerous questions calling for short answer responses (not yes/no questions) with defined sets of answers in drop down menus beneath those questions, and on several occasions none of the pre-selected responses seemed applicable or entirely accurate responses.

102.   D.P. received her digital IAC following submission of the IBCCES application.  The IAC includes I.L.'s photograph, birthdate, and contact information, notes that D.P. is not able to wait/queue in line for extended periods or stand in line with other guests, and lists the accommodations D.P. selected when filling out the IBCCES application, among other information.

103.   Next, D.P. received an email from Universal automatically upon completion of the IBCCES registration and application.  The email directed D.P. to indicate by reply email the best time for Universal to call D.P. to discuss her accommodation request.  D.P. immediately responded to the email indicating her availability to receive a call from Universal.[94]  However, following her reply email,

---

[94] As explained, this pertains to **step 2** of the process for requesting and obtaining accommodations at Universal, whereby "guests seeking accommodations are supposed to 'receive a call from Universal's Guest Services team before [they] arrive' in order to 'complete the process for being pre-approved for [the] AAP.'" *Supra* ¶ 73 &; *see also supra* ¶ 73 & n.32 ("Under Defendants' new policy, after 'all requirements for IBCCES Individual Accessibility Card are met, … a Universal [ ] Team Member will contact the cardholder to discuss their request for an attraction queue accommodation prior to their park visit.'") (citing Universal Studios Hollywood, *FAQs: Accessibility Information*, *supra*, and Universal Orlando Resort, *Accessibility Information*, *supra*).

**Universal never called or otherwise attempted to get in touch with D.P.** during the *two-week period* between her submission of the IBCCES application and response to Universal's email on or around September 28, 2023, and her scheduled park visit on October 8, 2023—despite the fact that D.P. completed the IBCCES pre-registration (step 1 of the process) far longer in advance of her park visit than Universal's policy requires.[95]  Thus, despite complying with Defendants' unlawful and humiliating pre-registration and documentation requirements, upon doing so D.P. did not receive any clarity as to whether she would actually receive the requested accommodations or not on the day of her park visit.[96]

---

[95] *See supra* ¶ 72 & n.28 (noting that eligible "[g]uests requesting an attraction queue accommodation [at Universal amusement parks] must obtain the IBCCES Individual Accessibility Card (IAC) by registering at www.accessibilitycard.org at least **48 hours prior to their visit** to the park") (citing Universal Studios Hollywood, *Accessibility Information for Your Visit*, *supra*, and Universal Orlando Resort, *Accessibility Information*, *supra*) (emphasis added).

[96] Although, as noted, J.M. did automatically receive a digital IAC from IBCCES following completion of the IBCCES application, the IAC itself clearly states:

> The sole purpose of this document is to pre-register you as an individual who may need accommodations. … **This document does NOT guarantee you any benefits or accommodations**.  **All accommodations afforded to individuals are at the sole discretion of the attraction**. Please present this document at the guest services desk upon arrival for details about what accommodations may be available. … The IBCCES Accessibility Card … establishes a person has a disability or requires other special needs while visiting a Facility.  Once granted, the IBCCES Accessibility Card is only notice of a disability and/or special needs based on the information the parent or guardian provides IBCCES.  The IBCCES Accessibility Card does not grant the holder access to any attractions or activities at a Facility. … Additionally, each individual Facility may require additional information from you in order to substantiate the disability or special need. … IBCCES does not represent or warrant that any person is suitable to perform any activities at a Facility as a result of possessing the IBCCES Accessibility Card.  **The Facility has the right to accept or deny your IBCCES Accessibility Card**.

Emphasis added.  Thus, completing the pre-registration through IBCCES and obtaining the IAC does not, in and of itself, guarantee the consumer anything by way of accommodation at Universal.

*See also* Touring Plans Blog, *Everything You Need to Know: Universal Studios' Attraction Assistance Pass* (Aug. 24, 2023), *supra* ("If [the applicant] do[es]

---

104.    Subsequently, or around October 8, 2023, D.P. visited Universal Studios Hollywood for Defendants' annual Halloween-themed event, Halloween Horror Nights.  Upon arrival at Universal Studios Hollywood, D.P. entered the Park, presented her IAC at Guest Services in accordance with the Park's disability access procedures, and requested that Defendants provide the accommodations listed thereon.  However, upon doing so, Defendants' employee told D.P. that Defendants had not approved the accommodations she requested when she submitted her IBCCES registration approximately two weeks earlier.  The employee could not and/or would not explain to her why that was, and no alternative form of accommodation was offered, suitable or otherwise.  Nor did the employee point D.P. in the direction of another employee that did know the reasoning or was able and willing to find that information out or otherwise assist her in obtaining necessary accommodation.  Therefore, even with the IAC, D.P. was still denied the necessary and reasonable accommodations she requested.

### **F.C.**

105.    Plaintiff F.C. ("F.C.") is a citizen of California, residing in La Verne, California.

106.    F.C. is a natural person with several ADA-qualifying disabilities—namely, diabetes and Autism Spectrum Disorder ("ASD" or "autism").  Diabetes "is a chronic disease that occurs either when the pancreas does not produce enough insulin or when the body cannot effectively use the insulin it produces."[97]

107.    As a result of F.C.'s diabetes, he experiences a variety of physically and mentally disabling symptoms, including, *inter alia*, suddenly "feeling tired and

---

not have a phone conversation with a [Universal] team member, the IAC alone will not be enough to guarantee [they] will be issued an AAP.").

[97] World Health Organization, *Diabetes* (Apr. 5, 2023), https://www.who.int/news-room/fact-sheets/detail/diabetes.

---

weak"[98] and the "need[] to urinate more often than usual."[99]   Thus, due to his

diabetes, F.C. is prone to sudden energy loss[100], he and must be able to urgently

access restrooms at a moment's notice and without delay.  Additionally, "[m]any

people with diabetes"—including F.C.—"develop problems with their feet from

nerve damage and poor blood flow."[101]   Indeed, F.C. frequently suffers from

"burning feet syndrome"—also known as Grierson-Gopalan syndrome—which

describes "a set of symptoms in which your feet become uncomfortably hot and

---

[98] Mayo Clinic, *Diabetes*, https://www.mayoclinic.org/diseases-conditions/diabetes/symptoms-causes/syc-20371444 ("Some of the symptoms of type 1 diabetes and type 2 diabetes [include, inter alia]: Feeling more thirsty than usual[;] Urinating often[; and] … **Feeling tired and weak**.") (emphasis added).

[99] World Health Organization, *Diabetes* (Apr. 5, 2023), *supra* ("Symptoms of diabetes may occur suddenly [and] … include[, *inter alia*]: feeling very thirsty[;] **needing to urinate more often than usual**[;] blurred vision[; and] feeling tired[.]") (emphasis added).

[100] *See* Medical News Today, *Effects of diabetes on the body and organs*, https://www.medicalnewstoday.com/articles/317483 ("Glucose, or blood sugar, is the main energy source for the human body.  It comes from the food people eat.  The hormone insulin helps the cells of the body convert glucose into fuel.  In type 1 diabetes, the body's immune system attacks cells in the pancreas and stops them from making insulin.  In type 2 diabetes, the body is not able to make insulin or the insulin does not work as it should.  In both types of diabetes, the amount of sugar in the blood becomes higher than it should be.") (emphasis added); *see also* Endocrine Society, *Diabetes and Endocrine Function* (Jan. 24, 2022), https://www.endocrine.org/patient-engagement/endocrine-library/diabetes-and-endocrine-function ("Diabetes occurs when the pancreas, a gland behind the stomach, does not produce enough of the hormone insulin, or the body cannot use insulin properly.  Insulin helps carry sugar from the bloodstream into the cells.  Once inside the cells, sugar is converted into energy for immediate use or stored for the future.  That energy fuels many of our bodily functions.  The body produces glucose from the foods you eat.  The liver also releases sugar when you are not eating.  The pancreas produces the hormone insulin, which allows glucose from the bloodstream to enter the body's cells where it is used for energy.  [With] diabetes, too little insulin is produced, or the body cannot use insulin properly, or both.  This results in a build-up of glucose in the blood.").

[101] World Health Organization, *Diabetes* (Apr. 5, 2023), *supra*.

---

painful."[102]  F.C.'s burning feet syndrome is a consequence of peripheral

neuropathy[103] caused by his diabetes and resulting nerve damage in his feet and legs.

---

[102] Cleveland Clinic, *Burning Feet Syndrome*, https://my.clevelandclinic.org/health/symptoms/17773-burning-feet-syndrome ("The most common Grierson-Gopalan syndrome symptoms include: Sensations of heat or burning[;] … [n]umbness in your feet or legs[; s]harp or stabbing pain[; f]eeling of heaviness in your feet[; d]ull ache in your feet[; s]kin redness or excess warmth[; and p]rickling, tingling or a feeling of 'pins and needles' (paresthesia).").

[103] *See id.* ("Peripheral neuropathy: This is one of the main causes of burning feet syndrome. It occurs when something damages the peripheral sensory nerves that connect your spinal cord to your arms and legs. People who've had diabetes for a long time and have had a history of high blood glucose levels are more likely to develop peripheral neuropathy. Diabetes-related peripheral neuropathy develops gradually and may worsen over time.").

*See also* Cleveland Clinic, *Peripheral Neuropathy*, https://my.clevelandclinic.org/health/diseases/14737-peripheral-neuropathy ("Peripheral neuropathy is an umbrella term for nerve diseases that affect a specific subdivision of your nervous system. … There are many different symptoms of peripheral neuropathy. … The symptom types … are: Motor[;] Sensory and pain[; and] Autonomic. … Motor symptoms include[, *inter alia*] … [m]uscle weakness[.] … Nerve deterioration from peripheral neuropathy weakens the connected muscles. That can cause … cause difficulty moving the toes, foot drop and hand weakness. Weakness can also affect muscles in the thighs, arms and elsewhere. … The sensory symptoms of peripheral neuropathy include: Tingling[,] … Numbness[,] … Imbalance and clumsiness[, and] … Pain.  Nerve damage from peripheral neuropathy can cause malfunctions in how and when nerves send pain signals, making pain signals more intense (hyperalgesia) or happen too easily (allodynia). It can even cause nerves to generate pain signals spontaneously. … Autonomic symptoms of peripheral neuropathy can include[, *inter alia*]: Blood pressure changes … [and] Bowel and bladder problems."); *see also id.* ("The most common cause of peripheral neuropathy is … diabetes. When your blood sugar is too high for too long, it damages your peripheral nerves. That's why people with type 2 diabetes can lose feeling in their feet and lower legs. … **Peripheral neuropathy is most likely to be permanent with chronic conditions like … diabetes**[.] … Pain from peripheral neuropathy is usually the most disruptive symptom[.] … Autonomic symptoms are among the most serious because they involve your body's vital functions. … Motor and sensory symptoms can also greatly disrupt your ability to work and go about your daily activities. They can cause problems — sometimes severe — with mobility, balance and coordination. Sensory symptoms are also disruptive, especially when they involve pain or affect your ability to control what you do with the affected body part(s).") (emphasis added); Mayo Clinic, *Diabetic neuropathy*, https://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/symptoms-causes/syc-20371580 ("Diabetic neuropathy is a type of nerve damage that can occur

---

Thus, as a result of his diabetes, F.C. experiences chronic physical pain and severe mobility limitations that render him unable to walk extensive distances or remain standing for significant periods.  F.C. therefore frequently requires the use of a wheelchair or motorized scooter, *e.g.*, in circumstances requiring him to stand for significant periods or walk long distances, as at the Amusement Parks, among other limitations.

108.   Furthermore, as a result of F.C.'s autism, he experiences heightened sensitivity to crowds, noise, and touch, and he has significant challenges with communication, social skills, sensory processing, fine motor skills, and executive functions.[104]  He also struggles with, *inter alia*, concentration and social interaction, especially in crowded settings.

109.   These physical and mental impairments therefore substantially limit several "major life activities," including F.C.'s ability to perform manual tasks, eat, walk, stand, speak, concentrate, think, communicate, and work.  42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating,

---

if you have diabetes. High blood sugar (glucose) can injure nerves throughout the body. Diabetic neuropathy most often damages nerves in the legs and feet. … [D]iabetic neuropathy symptoms include pain and numbness in the legs, feet and hands. … [F]or [some people], diabetic neuropathy can be quite painful and disabling. … There are four main types of diabetic neuropathy. … Peripheral neuropathy … [is a] type of neuropathy may [that] also be called distal symmetric peripheral neuropathy. It's the most common type of diabetic neuropathy. It affects the feet and legs first[.] … Signs and symptoms of peripheral neuropathy … may include: Numbness or reduced ability to feel pain or temperature changes[;] Tingling or burning feeling[;] Sharp pains or cramps[;] Muscle weakness[;] Extreme sensitivity to touch[;] … [and] Serious foot problems[.]").

[104] *See E.E. v. Norris Sch. Dist.*, 2023 WL 5528572, at *1 (E.D. Cal. Aug. 28, 2023), *report and recommendation adopted sub nom. E.E. by & through Hutchinson-Escobedo v. Norris Sch. Dist.*, 2023 WL 6927300 (E.D. Cal. Oct. 18, 2023) (finding ADA applicable to "minor who has been diagnosed with autism spectrum disorder" based on "significant challenges with communication, social skills, sensory processing, fine motor skills, executive functions, and behavior").

---

thinking, <u>communicating</u>, and <u>working</u>.") (emphasis added); *see also* 28 C.F.R. §

36.105(c)(1)(i); *see also* Cal. Gov't Code § 12926.1(c) ("[U]nder the law of this

state, 'working' is a major life activity[.]"); *id*. § 12926(j)(1)(C) ("'Major life

activities' shall be broadly construed and shall include … working."); *id*. §

12926(m)(1)(B)(iii) (same).  Additionally, F.C.'s impairments impede "operation of

[a variety of] major bodily function[s]," *see* 42 U.S.C. § 12102(2)(B), including

F.C.'s musculoskeletal,[105] endocrine,[106] cardiovascular,[107] circulatory,[108] bladder,[109]

and brain[110] functions.  *See* 42 U.S.C. § 12102(2)(B) ("[A] major life activity also

---

[105] *See* 28 C.F.R. § 36.105(d)(2)(iii)(D) ("[M]obility impairments requiring the use of a wheelchair substantially limit musculoskeletal function[.]"); *accord* 29 C.F.R. § 1630.2(j)(3)(iii) (same).

[106] *See* 28 C.F.R. § 36.105(d)(2)(iii)(H) ("Diabetes substantially limits endocrine function[.]"); *accord* 29 C.F.R. § 1630.2(j)(3)(iii) (same).  *See also* Endocrine Society, *Diabetes and Endocrine Function* (Jan. 24, 2022), *supra*.

[107] *See* Medical News Today, *Effects of diabetes on the body and organs*, *supra* ("**Circulatory and cardiovascular systems**[:] High blood glucose levels can cause damage to all parts of the cardiovascular system.  For this reason, there is a close link between diabetes and cardiovascular problems.") (emphasis in original); *id*. ("According to the Centers for Disease Control and Prevention (CDC), cardiovascular disease is the leading cause of early death among people with diabetes.  The CDC add that people with diabetes are two to three times more likely to have a stroke or die of some form of heart disease than those without diabetes. People with diabetes also tend to develop more serious heart problems at an earlier age than people without the condition.").

[108] *See id*. ("Excess blood sugar decreases the elasticity of blood vessels and causes them to narrow, impeding blood flow.  This can lead to a reduced supply of blood and oxygen, increasing the risk of high blood pressure and damage to large and small blood vessels. … Damage to large blood vessels is known as macrovascular disease, while microvascular disease refers to damage to small blood vessels. … Poor circulation affects the body's ability to heal when there is a wound or an infection. This is due to a low supply of blood, oxygen, and nutrients.  A person with diabetes should check their skin regularly for wounds and see their doctor if they have any signs of an infection, including redness, swelling, or fever.").

[109] *See* World Health Organization, *Diabetes* (Apr. 5, 2023), *supra* ("Symptoms of diabetes may occur suddenly [and] … include[, *inter alia*,] … needing to urinate more often than usual[.]") (emphasis added).

[110] *See* 28 C.F.R. § 36.105(d)(2)(iii)(E) ("Autism substantially limits brain function[.]"); *accord* 29 C.F.R. § 1630.2(j)(3)(iii) (same).

---

includes the operation of a major bodily function, including but not limited to, … bladder, … brain, … circulatory, [and] endocrine, … reproductive functions."); *see also* 28 C.F.R. § 36.105(c)(1)(ii) ("Major life activities  include, but are not limited to: … (ii) The operation of a major bodily function, such as the functions of the … **bladder**, … **brain**, … **circulatory**, **cardiovascular**, **endocrine**, … [and] **musculoskeletal**[] … systems.") (emphasis added); *accord* 29 C.F.R. § 1630.2(i)(1)(ii) (same).  Accordingly, F.C.'s D.P.'s impairments constitute disabilities under the ADA, Unruh Act, and CDPA.  *See* 42 U.S.C. § 12102(1)-(2); *see also* Unruh Act, Cal. Civ. Code § 51(e)(1); CDPA, Cal. Civ. Code § 54(b)(1); Cal. Gov't Code § 12926(m), (j); *id.* § 12926.1.[111]

110.   As a result of his disabilities, in order to make full use and enjoyment of Defendants' facilities, F.C. requires that Defendants provide him with various reasonable accommodations commonly extended to similarly situated individuals at amusement parks including, *inter alia*, standing/queuing accommodations.

111.   F.C. was a "Gold Annual Pass" season ticket holder during the 2023-2024 season at Universal Theme Parks, and he visited Universal Studios Hollywood in California on or around January 12, 2024.  He arrived to the Park using a motorized scooter to assist with his mobility issues caused by diabetes-related nerve damage and resulting chronic pain, which includes sudden burning in the feet and legs.

112.   Prior to this park visit, F.C. was entirely unaware of the new procedures that had been implemented at Universal for requesting accommodations through IBCCES, and he assumed that he could request the necessary accommodations in person at Guest Services inside the Park, without any need to register online prior to arrival—as was the case under Defendants' prior disability access program, which

---

[111] *See also, e.g.*, 28 C.F.R. § 36.105(b)(2) ("Physical or mental impairment includes … diabetes …."); *Scanlon v. Cnty. of Los Angeles*, 92 F.4th 781, 803 n.9 (9th Cir. 2024) ("We have long recognized that autism is a condition within the scope of the ADA.") (citations omitted).

F.C. had utilized in the past and with which he was familiar.  As a result, F.C. did not register with IBCCES or submit a request for accommodations through the IBCCES website in advance of his January 2024 park visit.  Instead, F.C. sought necessary and reasonable accommodations in-person upon arrival to Universal Studios Hollywood on the day of his park visit.  However, upon doing so, Defendants refused to issue an Attraction Assistance Pass or entertain his request for accommodations.  Defendants' representatives explained to F.C. that, per Universal's new policy, guests requesting an attraction queue accommodation <u>must</u> obtain the IBCCES Individual Accessibility Card by registering with the IBCCES website at least 48 hours prior to their visit to the park, and that only IBCCES can issue the IBCCES Accessibility Card, not Universal Studios Hollywood.

113.   Stated otherwise, to be able to request or receive accommodations, F.C. must have already submitted the IBCCES application prior to the date of his park visit, and this is the exclusive method for requesting park accommodations at Universal.  Thus, since F.C. failed to satisfy that pre-registration requirement at least two days before arriving to the park, Universal would not issue an Attraction Assistance Pass or even consider his request for accommodations in connection with F.C.'s park visit because, per Defendants' policy, his request was made in poor timing and improper form, leaving his disability status and need for accommodation unsubstantiated after the deadline.  This was F.C.'s first time hearing of IBCCES or any new procedure for requesting accommodation at Universal, and the message came too late.

114.   In effect, Defendants' procedure for requesting accommodation requires that all applicants divulge the nature and extent of their disabilities, without any consideration of the specific impairment or accommodation sought, and it is entirely inflexible as to the types of documentation accepted and the form and timing of an individual's request for accommodation.

115.   Thus, because J.M. did not register with IBCCES and complete the

application for accommodations through the IBCESS website prior to his January 12, 2024 park visit, F.C. received no accommodation at Universal during that visit. In other words, in or around January 2024, F.C. was: denied "full and equal enjoyment of" Defendants' Amusement Parks (42 U.S.C. § 12182(a)); "deni[ed] of the opportunity … to participate in or benefit from the goods, services, privileges, advantages, or accommodations" of the Parks (42 U.S.C. § 12182(b)(1)(A)(i)); and relegated to "participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that w[as] not equal to that afforded" to nondisabled individuals who visit the Parks (42 U.S.C. § 12182(b)(1)(A)(ii)).

116.   F.C. loves amusement parks generally and would like to visit Defendants' nearby Universal Studios Hollywood in the future, but only if he can make full use and enjoyment of Defendants' facilities, services, goods, and accommodations, *i.e.*, without discrimination in any form—including in the forms of separate, unequal, and lesser treatment and harm to F.C.'s legitimate dignity and/or privacy interests.  However, if he goes to Universal without pre-registering with IBCCES, he will once again be denied necessary and reasonable accommodations required for F.C. to fully use and enjoy the Amusement Parks.  And if he complies with Universal's disability access policy and timely submits his accommodation request by pre-registering with IBCCES—which unlawfully requires that F.C. disclose sensitive personal information and medical documentation detailing the nature and extent of his impairments to a third-party with whom he has no desire to commence a commercial relationship—he will suffer irreparable harm to his dignity and privacy interests.

### F.   Defendants Violate The ADA, Unruh Act, And CDPA

117.   "To prevail on a Title III discrimination claim, [Plaintiffs] must establish that: (1) he is disabled within the meaning of the ADA; (2) [Universal] is a private entity that owns, leases, or operates a place of public accommodation; and (3) [Universal] discriminated against him by denying him public accommodations

because of his disability." *Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1033 (9th Cir. 2020) (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007) and 42 U.S.C. §§ 12182(a)–(b)).  As explained above, the first two elements are satisfied here because Plaintiffs' impairments are "disabilities" within the meaning of the ADA, and there is no question that Defendants are private entities and that the Universal Theme Parks are places of public accommodation.

118.   The third element of an ADA claim – that Universal "discriminated against [Plaintiffs] by denying [them] public accommodations because of [their] disabilit[ies]," *Lopez*, 974 F.3d at 1033 – is also satisfied here.  Specifically, Defendants deny disabled persons full use and enjoyment of the Amusement Parks and therefore violate the ADA in the following five ways.

119.   **First**, pursuant to the ADA's implementing regulations, a "public accommodation shall not ask about the nature or extent of a person's disability … [and] shall not require documentation[.]"  28 C.F.R. § 36.302(c)(6).  Further, as the DOJ's commentary accompanying its rulemaking confirms, a covered entity must assess accommodation requests on a case-by-case basis, taking into account, *inter alia*, the specific accommodation sought.  *See* Final Rule, 75 Fed. Reg. at 56236 ("[T]his determination is an individual assessment and must be made on a case-by-case basis.").  And here, Defendants violated the ADA by requiring Plaintiffs and all disabled persons seeking accommodations at the Amusement Parks to submit sensitive medical documentation in support of their accommodation requests, simultaneously with submission of the request through the IBCCES website.  *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *8 (C.D. Cal. Feb. 12, 2014) ("[T]he regulation [under 28 C.F.R. § 36.302(c)(6)] prohibits all inquiries regarding the nature or extent of a person's disability other than the two exceptions specified [in that section].").

120.   **Second**, Defendants violate the ADA because the pre-screening process for accommodation requests, which includes advance registration and

documentation requirements, prevents disabled persons from using and enjoying the Amusement Parks in the same manner that nondisabled persons may do so.  To determine whether a covered entity denies access to disabled persons based on such requirements, "courts consider how a facility is used by nondisabled guests and then determine whether the facility 'provide[s] disabled guests with a like experience.'" *T.P. v. Walt Disney Parks & Resorts U.S., Inc.*, 2021 WL 3598573, at *3 (C.D. Cal. Apr. 20, 2021) (citation omitted).  Pursuant to the ADA, Unruh Act, and CDPA, "the facility [must] provide disabled guests with 'an experience comparable to that of able-bodied patrons.'" *Id*. (citation omitted); *see also Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) ("Public accommodations must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. … [P]ublic accommodations must consider using or adapting [] to help disabled guests have an experience more akin to that of non-disabled guests.").  In this case, nondisabled guests visiting Defendants' Amusement Parks may purchase their tickets for admission to the Universal Theme Parks at, and upon arrival to, Defendants' facilities, and they may then enter the Parks and enjoy all the benefits on offer, without any advance planning or preparation.  This flexibility is particularly important for season ticket holders who live in the same general area as one of the Parks, because such guests may reasonably opt to visit Universal spontaneously.  It is therefore essential that a guest with disabilities be able to purchase a ticket for admission to the Park in-person upon arrival to Defendants' facility, seek and obtain the necessary accommodations, and fully use and enjoy the Park all within the same day, without any prior planning.  *See* 28 C.F.R. § 36.302(f)(1)(ii) ("A public accommodation that sells tickets for a single event or series of events shall modify its policies, practices, or procedures to ensure that individuals with disabilities have an equal opportunity to purchase tickets for accessible seating[] … [d]uring the same hours; … [t]hrough the same methods of distribution; … [i]n the same types and

numbers of ticketing sales outlets, including telephone service, in-person ticket sales at the facility, or third-party ticketing services, as other patrons; and [ u]nder the same terms and conditions as other tickets sold for the same event or series of events.") (emphasis added).  **Yet, because disabled persons must gather the necessary medical documentation and submit it with their application on the IBCCES website _prior_ to their Park visit, persons with disabilities do not have that same luxury afforded to nondisabled persons.**  Stated otherwise, although Defendants' policies permit nondisabled guests to make full use and enjoyment of Defendants' facilities during a spontaneous park visit, persons with disabilities that require accommodations, like Plaintiffs, may not.  **In this regard, Plaintiffs' experiences at Universal were not comparable to the experiences of nondisabled patrons**.

121.   Thus, Defendants denied Plaintiffs an experience "akin to that of non-disabled guests" at Universal Theme Parks, _Baughman_, 685 F.3d at 1135.  In doing so, Universal deprived Plaintiffs and members of the putative Class of the full and equal enjoyment of the Amusement Parks, in violation of the ADA's general rule set forth by Section 12182(a).  _See_ 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the _full and equal enjoyment_ of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]") (emphasis added).

122.   For the same reasons, Defendants also violated the general prohibitions under Sections 12182(b)(1)(A)(i) and 12182(b)(1)(A)(ii), in that the disparate experience of disabled and nondisabled persons at Defendants' Amusement Parks: (1) denied Plaintiffs the opportunity to participate in or benefit from the same goods, services, and privileges afforded to nondisabled persons, _see_ 42 U.S.C. § 12182(b)(1)(A)(i); and (2) forced Plaintiffs to participate in an benefit unequal to that afforded nondisabled park guests, _see id._ § 12182(b)(1)(A)(ii).

123.   **Third**, Defendants' pre-screening process for accommodation requests

constitutes an unlawful "administrative method" because it is a "criteria or method[] of administration[] … that ha[s] the effect of discriminating on the basis of disability," in violation of 42 U.S.C. § 12182(b)(1)(D).  *See id*. ("Administrative methods[.]  An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration—(i) that have the effect of discriminating on the basis of disability[.]").

124.   **Fourth**, Defendants failed to make reasonable modifications in policies, practices, or procedures, in two regards: (1) by implementing, and failing to appropriately modify, the Attraction Assistance Program such that it complies with the ADA; and (2) by failure to properly trained regarding the civil rights, communication needs, and privacy considerations of disabled individuals.  *See* 42 U.S.C. § 12182(b)(2)(A)(ii) (prohibiting "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities…").

125.   **Fifth**, Defendants' Attraction Assistance Program imposes "eligibility criteria" that tends to screen out disabled individuals.  *See* 42 U.S.C. § 12182(b)(2)(A)(i) (prohibiting "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations").

126.   For the same reasons, Defendants "also violated the Unruh Act, as '[a] violation of the right of any individual under the [ADA] shall also constitute a violation of this section.'"  *Hurley v. Loma Linda Univ. Med. Ctr.*, 2014 WL 580202, at *9 (C.D. Cal. Feb. 12, 2014) (citing Cal. Civ. Code § 51(f)).

127.   Likewise, "Defendants have violated the California Disabled Persons Act because '[a] violation of the right of an individual under the [ADA] also constitutes a violation of this section,' Cal. Civ. Code § 54(c), and the [Amusement

1    Parks are] … facilit[ies] open to the general public, *see id.* § 54.1(a)(1)." *Hurley*,

2    2014 WL 580202, at *10.

3        128.   Based on the above ADA violations and pursuant to 42 U.S.C. §

4    12188(a)(2), Plaintiffs seek, individually and on behalf of all others similarly

5    situated, a permanent injunction requiring that:

6                 a.   Defendants take all steps necessary to bring their disabilities

7                    accommodations request process into full compliance with the

8                    requirements set forth in the ADA, and its implementing

9                    regulations, including by modifying the Attraction Assistance

10                   Program to: (i) enable persons with disabilities to seek

11                   accommodations at the Universal Theme Parks at the time and

12                   place of their Park visits and without need for advance

13                   registration through the IBCCES website; and (ii) eliminate the

14                   blanket requirement that all disabled persons must submit

15                   personal medical information and documentation in support of

16                   their request, without regard to the particular nature of the

17                   accommodations sought;

18                b.   Defendants adequately train park employees regarding the civil

19                   rights, communication needs, privacy considerations, and how to

20                   interact with disabled individuals; and

21                c.   Plaintiffs' representatives monitor Defendants' facilities to

22                   ensure the injunctive relief ordered pursuant to Subparagraphs (a)

23                   and (b) above has been implemented and will remain in place.

24       129.   Plaintiffs also seek, individually and on behalf of all others similarly

25   situated, injunctive relief under the Unruh Act, as well as statutory damages equal to

26   not less than $4,000 per violation, per Class Member.  *See* Cal. Civ. Code §§ 55,

27   52(a).

28       130.   In the alternative, Plaintiffs, individually and on behalf of all others

similarly situated, seek statutory damages under the CDPA equal to not less than $1,000 per violation, per Class Member.  *See* Cal. Civ. Code § 54.3.

## CLASS ACTION ALLEGATIONS

131.  ***Class and Subclass Definition***.  Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of Classes and Subclasses of similarly situated individuals, defined as follows:

(a)  ***The Impermissible Inquiry Classes.***

(i)  ***Nationwide Class.***  Plaintiff D.P. seeks to represent a class of similarly situated individuals, defined as all persons in the United States with an ADA-qualifying disability who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, submitted an IBCCES application for accommodations in connection with a planned visit to any of Defendants' theme, amusement, and/or water parks in the United States (the "Impermissible Inquiry Class" or "Nationwide Impermissible Inquiry Class").

(ii)  ***California Subclass.***  Plaintiff D.P. also seeks to represent a subclass comprised of all Class Members residing in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, submitted an IBCCES application in connection with a planned visit to any of Defendants' theme, amusement, and/or water parks in California (the "Impermissible Inquiry Subclass" or "California Impermissible Inquiry Subclass").

(b)  ***The Inability To Seek Accommodations ("ISA") Classes.***

(i)  ***Nationwide Class.***  Plaintiff F.C. seeks to represent a class

of similarly situated individuals, defined as all persons in the United States with an ADA-qualifying disability who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, visited any of Defendants' theme, amusement, and/or water parks in the United States without having registered in advance with IBCCES and were therefore unable to seek accommodations at Universal's facilities on the day of the individual's park visit (the "ISA Class" or "Nationwide ISA Class").

(ii)   ***California Subclass.***  Plaintiff F.C. also seeks to represent a subclass comprised of all Class Members residing in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, visited any of Defendants' theme, amusement, and/or water parks in California without having registered in advance with IBCCES and were therefore unable to seek accommodations at Universal's facilities on the day of the individual's park visit (the "ISA Subclass" or "California ISA Subclass").

132.   Excluded from the Classes and Subclasses are: (1) Defendants and their officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (2) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (3) the Judge(s) assigned to this case and any members of their immediate families.

133.   Plaintiffs reserve the right to amend the definition of the Classes and Subclasses if discovery or further investigation reveals that the Classes and/or Subclasses should be expanded or otherwise modified.

134.   The Nationwide Class seeks preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order that will prevent Defendants from continuing with their violations of the ADA, *see* 42 U.S.C. § 12188(a); 42 U.S. Code § 2000a–3, as well as an award of costs and reasonable attorneys' fees, *see* 42 U.S.C. § 12188(b).  Additionally, the California Subclass seeks class wide damages pursuant to the Unruh Act, Cal. Civ. Code § 52(a), in the amount of $4,000 per violation, and, pursuant to the CDPA, Cal. Civ. Code § 54.3, in the amount of $1,000 per violation, based on Defendants' wrongful policy and practice of failing to provide full and equal access to disabled Californians as alleged herein.

135.   This action should be certified as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure for the Nationwide Class and California Subclass because the Class and Subclass each satisfy the class action prerequisites of numerosity, commonality, typicality, and adequacy, as described below.

136.   ***Numerosity.***  Members of the Class and Subclass are so numerous that their individual joinder herein is impracticable.  On information and belief, the Nationwide Class and California Subclass each comprise at least millions of disabled individuals throughout the United States and California, respectively, who have been harmed and suffered discrimination due to Defendants' failure to comply with the ADA's requirements.  The precise number of Class and Subclass members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class and Subclass members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

137.   ***Commonality and Predominance***.  There is a well-defined community of interest and common questions of law and fact exist as to all Class and Subclass members and predominate over questions affecting only individual Class and Subclass members.  Specifically, all Class and Subclass members have been denied

their civil rights to full and equal access to, and use and enjoyment of, Defendants' facilities and/or services due to Defendants' failure to comply with federal and state law as described above.  Common legal and factual questions include, but are not limited to: whether Plaintiffs are disabled within the meaning of the ADA, Unruh Act, Section 504, and the CDPA; whether Defendants operate places of public accommodations; whether Defendants' Attraction Access Pass program and other unlawful conduct as alleged herein comply with the provisions of Title III of the ADA, 42 U.S.C. §§ 12101, *et seq*.; whether Defendants' policies and practices comply with the provisions of California's Unruh Act, Cal. Civ. Code §§ 51, *et seq*.; whether Defendants' policies and practices comply with the provisions of California's CDPA, Cal. Civ. Code §§ 54, *et seq*.; whether Defendants should be enjoined from further engaging in the misconduct alleged herein; whether Plaintiffs and members of the Class and Subclass are entitled to statutory damages pursuant to the Unruh Act and/or CDPA; and whether Plaintiffs and members of the Class and Subclass are entitled to attorneys' fees and costs.  The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendants' encounters with disabled individuals seeking accommodations in their facilities.

138.    ***Typicality.***  The claims of Plaintiffs are typical of the claims of the Class and Subclass in that Plaintiffs and members of the Class and Subclass were injured as a result of Defendants' uniform wrongful conduct, based upon Defendants' unlawful policy and practice of failing to provide full and equal access to disabled individuals in the United States and California as alleged herein.

139.    ***Adequacy.***  Plaintiffs will fairly and adequately protect Class and Subclass members' interests.  Plaintiffs have no interests antagonistic to Class and Subclass members' interests, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class actions and consumer protection cases.

140.   ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

141.   Additionally, class certification of the Nationwide Class and California Subclass is appropriate under Fed. R. Civ. Proc. 23(b)(2) because Defendants have acted on or refused to act on grounds generally applicable to the Class and Subclass, making appropriate declaratory, injunctive, and equitable relief with respect to the Plaintiffs and the Class and Subclass as a whole.

142.   Without a class action, Defendants will continue a course of action that will result in further injury to Plaintiffs and members of the Class and Subclass, and will likely retain the benefits of their wrongdoing.

143.   Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

**COUNT I**
**Violations of Title III of the Americans with Disabilities Act of 1990 ("ADA"),**
**42 U.S.C. §§ 12101, *et seq.***
**(On Behalf Of The Nationwide Class And California Subclass)**

144.   Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

145.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendants.

146.   Defendants own, lease, and/or operate a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7) ("place of exhibition and entertainment," "place of recreation," "sales or rental establishment," and "service establishments").

147.   At all times relevant to the action, Plaintiffs have suffered from several ADA-qualifying disabilities.  *See* 42 U.S.C. § 12102(1)(A); *see also supra*.  These physical and mental impairments substantially limit several of Plaintiffs' "major life activities" and "major bodily functions," as described above.  42 U.S.C. § 12102(2)(A)-(B).

148.   Defendants violated, and continue to violate, the general rule set forth by the ADA under 42 U.S.C. § 12182(a) because their Attraction Assistance Program, including the pre-screening, timing, and documentation requirements thereunder, and their failure to properly train Park employees to respectfully communicate with and assist disabled persons seeking accommodation at Defendants' facilities discriminates against such persons in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the Universal Theme Parks.  *See* 42 U.S.C. § 12182(a) ("No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.").

149.   Based on the same conduct as described in the paragraph above, Defendants also violated, and continue to violate, the following provisions of the ADA:

      a.    42 U.S.C. § 12182(b)(1)(A)(i) (**denial of participation**), in that Defendants have "subject[ed] an individual or class of individuals [Plaintiffs and putative Class Members] on the basis of a disability …, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity;"

b.  42 U.S.C. § 12182(b)(1)(A)(ii) (**participation in unequal benefit**), in that Defendants "afford[ed] an individual or class of individuals [Plaintiffs and putative Class Members], on the basis of a disability …, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals;"

c.  42 U.S.C. § 12182(b)(1)(A)(iii) (**separate benefit**), in that Defendants "provide[d] an individual or class of individuals, on the basis of a disability …, directly, or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals …;"

d.  42 U.S.C. § 12182(b)(1)(D) (**administrative methods**), in that Defendants have, "directly or through contractual or other arrangements, utilize[d] standards or criteria or methods of administration … that have the effect of discriminating on the basis of disability; [and/]or … that perpetuate the discrimination of others who are subject to common administrative control;"

e.  42 U.S.C. § 12182(b)(2)(A)(i) (**eligibility criteria**), in that Defendants "impos[ed] or appli[ed] [] eligibility criteria that screen[s] out or tend[s] to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations …;"

f.  42 U.S.C. § 12182(b)(2)(A)(ii), in that Defendants "fail[ed] to make reasonable modifications in policies, practices, or

procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities ….."

150. Further, the requirement that all guests seeking accommodation at Defendants' Parks must submit sensitive medical documentation to request accommodation violates the federal regulations implementing Title III of the ADA, including the rule that "[a] public accommodation shall not ask about the nature or extent of a person's disability … [and] shall not require documentation[.]" 28 C.F.R. § 36.302(c)(6).

151. Removing the blanket documentation requirement and permitting guests to request accommodations in-person, on the same day as their Park visit, would not "fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered" at the Amusement Parks, and "[n]or would [it] result in an undue burden[.]" 42 U.S.C. § 12182(b)(2)(A)(ii).

152. As set out above, absent injunctive relief, there is a clear risk that Defendants' actions will recur with Plaintiffs and/or other disabled individuals seeking Defendants' amusement park services.

153. Plaintiffs are therefore entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1) and/or common law.

## COUNT II
### Violations of California's Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code §§ 51, *et seq.*
### (On Behalf Of The California Subclass)

154. Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

155. Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

156. Defendants are a business establishment within the meaning of the

Unruh Act. Defendants are the owners and operators of business establishments.

157.   The Unruh Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their … disability[ or] medical condition … are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

158.   The Unruh Act further provides that "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." Cal. Civ. Code § 51(f).

159.   Defendants violated the Unruh Act by discriminating against Plaintiffs through violations of the ADA, as described in detail above.  Specifically, based on their inflexible Attraction Assistance Program, including the burdensome pre-screening, timing, and documentation requirements thereunder, Defendants discriminate against disabled persons in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the Universal Theme Parks, in violation of the ADA under 42 U.S.C. § 12182(a) (general rule), 42 U.S.C. § 12182(b)(1)(A)(i) (denial of participation), 42 U.S.C. § 12182(b)(1)(A)(ii) (participation in unequal benefit), 42 U.S.C. § 12182(b)(1)(A)(iii) (separate benefit), 42 U.S.C. § 12182(b)(1)(D) (administrative methods), 42 U.S.C. § 12182(b)(2)(A)(i) (eligibility criteria), and 42 U.S.C. § 12182(b)(2)(A)(ii) (failure to make reasonable modifications in policies, practices, or procedures), as well as the ADA's implementing regulations set forth under, *inter alia*, 28 C.F.R. § 36.302.  These violations are ongoing.

160.   Defendants have also failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Unruh Act.

161.   Plaintiffs are entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and losses they sustained as a result of Defendants' discriminatory conduct pursuant to Cal. Civ. Code § 52.

162.   Plaintiffs are further entitled to seek and recover statutory, punitive, and/or exemplary damages to rectify and deter Defendants' discriminatory conduct as hereinbefore alleged, pursuant to Cal. Civ. Code § 52.

### COUNT III
### Violations of the California Disabled Persons Act ("CDPA"),
### Cal. Civ. Code §§ 54, *et seq*.
### (On Behalf Of The California Subclass)

163.   Plaintiffs re-allege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

164.   Plaintiffs bring this claim individually and on behalf of the members of the proposed California Subclass against Defendants.

165.   The CDPA, Cal. Civ. Code §§ 54-54.3, guarantees full and equal access for people with disabilities to all accommodations, advantages, facilities, and privileges of "all places of public accommodation" and "other places to which the general public is invited."  Defendants' Amusement Parks located throughout California constitute "places of public accommodation" or "other places where the public is invited" within the meaning of the CDPA.

166.   Defendants' Amusement Parks constitute goods, services, facilities, advantages, privileges, and/or accommodations provided by Defendants to members of the public in California and are, therefore, subject to the access requirements of Cal. Civ. Code § 54.1, which is applicable to "all places of public accommodation" and "other places to which the general public is invited."

167.   Defendants are violating the right of disabled persons to full and equal access to public places by denying full and equal access to Defendants' Amusement Parks, in violation of Cal. Civ. Code §§ 54-54.3.

168.   Defendants are also violating the CDPA, in that their actions are a violation of the ADA.  Any violation of the ADA is also a violation of Cal. Civ. Code § 54.1.

169.   As a result of Defendants' wrongful conduct, the individually named

Plaintiffs and the California Subclass are entitled to statutory minimum damages under Cal. Civ. Code § 54.3 for each offense.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

a.  For an order certifying the Nationwide Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Class and Subclass, and naming Plaintiffs' attorneys as Class Counsel to represent the proposed Class and Subclass;

b.  For an order declaring Defendants' conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiffs and the Class and Subclass on all counts asserted herein;

d.  For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

g.  For injunctive relief as pleaded or as the Court may deem proper; and

h.  For an order awarding Plaintiffs and the Class and Subclass their reasonable attorneys' fees, expenses, and costs of suit.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  April 9, 2024                Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   _/s/ Julia K. Venditti_
        Julia K. Venditti

Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
         jvenditti@bursor.com

*Attorneys for Plaintiffs and the Putative Class*